## BUETTNER *v.* STATE
## BOWYER *v.* STATE

(Two Appeals in One Record)

[No. 101, September Term, 1963.]

236

Decided January 7, 1964.

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ.

*E. Thomas Maxwell, Jr.*, for the appellants.

*Russell R. Reno, Jr., Assistant Attorney General*, with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney for Baltimore City*, and *Andrew J. Graham, Assistant State's Attorney*, on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

After conviction of murder in the first degree by a judge, sitting without a jury, in the Criminal Court of Baltimore, and being sentenced therefor, appellants seek relief in this Court.

Only two questions are presented for determination: (1) was there an illegal search of certain premises and an unlawful seizure of property offered in evidence against the appellants; and (2) was the evidence sufficient to support a finding of guilty of murder in the first degree?

At 4:15 a.m., on July 12, 1962, Officer Faller was patrolling his beat. He was informed that a "man" was lying in a nearby alley. He immediately went to the alley and found the badly battered dead body of Robert J. Shipley. The body was covered with blood, and the clothes thereon were ripped and torn. It was lying beneath a partially-opened window, which was about twelve feet above the alley and a part of the premises known as 7 W. Preston Street. It later developed that Shipley had been dead for some time before his body was discovered.

Additional police were summoned, and, after observing the dead body, some of them spoke with the occupants of the base-

ment apartment at 7 W. Preston Street, Mr. and Mrs. Brown. The officers were advised that at approximately 1:30 a.m., the Browns had been awakened by noises coming from the upstairs apartment. The noises were described as being that of a person being "hit hard against the floor or either he was being stomped." The Browns heard the victim moaning, and heard him say, "please don't take the last five dollars I have—that is all I have got for my family to eat on." They also advised the police they heard a man demand the victim's car keys and driver's license, and a woman's voice say, "if you don't keep quiet I will stomp you in the face." Then they heard a noise "like someone being hit real hard—a big gasp," and, after quietness for about fifteen minutes, a "thud" outside their bedroom window at about 2:30 a.m.

The police concluded their interview with the Browns at about 5:00 a.m.; then they went upstairs to the second-floor apartment, opened the door and entered it. Observing that no one was there, but that a recent bloody struggle had taken place there, the police proceeded to search the apartment, take photographs, and process certain objects for fingerprints. These photographs, a fingerprint belonging to appellant Buettner, a blood-stained rug, and certain items found upon the premises belonging to the deceased were admitted into evidence, over objection, at the trial. Some of the items belonging to the deceased were his identification papers, which were found in the commode. The evidence disclosed that the victim had had a wallet and money, but a search of his person revealed neither.

We turn now to a brief history of the appellants. The appellant Buettner had been living at her and her husband's apartment residence in Baltimore with her husband and her nephew, the appellant Bowyer. On June 23, 1962, she left her husband, and, accompanied by her nephew, took a meandering trip down into Virginia. On or about July 4, 1962, they arrived at 7 W. Preston Street, where they spent the first two nights in the basement apartment and then moved upstairs. Although Buettner and her husband were separated, he went to see her and the nephew, and, on occasion, drank with them at public taverns.

On July 11, 1962, all three of them were drinking at such

a tavern. The deceased was also there. According to the appellants, there came a time when Bowyer wanted to go home, but his aunt was not yet ready. Bowyer and Buettner's husband left and went to the apartment. Buettner then started drinking with the deceased, and, after about one hour, she invited him to take her home, which he did. Her arrival with a male companion angered her nephew, and he struck Shipley, knocking him down (and he "smashed [Shipley] a few more times"), and smacked his aunt. Without giving their additional testimony in detail, they both claimed that Buettner's husband was present at the apartment and it was he who killed Shipley.[1] (Bowyer admitted, however, that he had taken the car keys from the victim and moved his automobile.) Thereafter, all three left and went to the husband's apartment, it being the former residence, mentioned above, of the husband, wife and nephew. Here, at about 3:00 a.m., approximately an hour or an hour and a half before the police searched the Preston Street apartment, the appellants, at the suggestion of Buettner's husband (according to the appellants), decided to leave town. Mr. Buettner advised appellants that "he would give them the money to leave town on." Arrangements for their departure were completed the next day, and, after the purchase of articles of clothing by the appellants and being driven by private car to Washington, D. C., in order to avoid possible detection, they boarded a bus for Altavista, Virginia, where (still according to their story) they were, later, to meet Mr. Buettner, and then they and Mr. Buettner would "all leave together." Several days later, the appellants were apprehended in Altavista and returned to Baltimore for trial. The record does not show that Mr. Buettner was in Altavista at the time of their arrest.

Judge Harlan found them guilty of murder in the first degree under Code (1957), Article 27, § 410, on the theory they had committed a murder in the perpetration of a robbery.

# I

Appellants contend that the entry into "their apartment" without a warrant, and the seizure of evidence therein were

---

1. The husband was also charged with murder, but obtained a severance.

clearly illegal, which rendered the seized evidence and the testimony of the police as to their observations while in the apartment inadmissible. They, of course, cite *Mapp v. Ohio,* 367 U. S. 643. And they also cite *Hall v. Warden,* 313 F. 2d 483 (C. A. 4) ; *Walker v. Peppersack,* 316 F. 2d 119 (C. A. 4) ; *Chapman v. United States,* 365 U. S. 610; and *United States v. Jeffers,* 342 U. S. 48.

It is true that *Mapp* extended to state criminal prosecutions the prohibition against the use by the State in a criminal proceeding of evidence obtained as the result of an illegal search and seizure.[2] However, the Fourth Amendment, which is, of course, controlling does not proscribe all searches and seizures made without a search warrant, but it inhibits "unreasonable" searches. *United States v. Rabinowitz,* 339 U. S. 56; *Givner v. State,* 210 Md. 484, 124 A. 2d 764. We, therefore, proceed to a consideration of whether the search and seizure herein made were reasonable.

There can be little doubt that the general rule is that a search of private premises should be pursuant to a legally issued warrant. *Agnello v. United States,* 269 U. S. 20 (1925). However, the courts have recognized exceptions to this general rule; and one of those exceptions permits the search of a dwelling unit, which has been vacated and abandoned by its former occupants.[3] The evidence, we think, clearly established that the appellants had abandoned the Preston Street apartment before the police entered it on the morning of July 12th. The record is silent as to any lease or the payment of rent, but, apparently it was rented furnished. Judge Harlan observed that neither of the appellants worked, and "were living without visible

---

2. Mapp was a culmination of a doctrine that was also dealt with in Weeks v. United States, 232 U. S. 383, and Wolf v. Colorado, 338 U. S. 25.

3. For some cases where the courts have recognized other exceptions, see United States v. Rabinowitz, supra; Ker v. California, 374 U. S. 23; Annotation 94 L. Ed. 671 (search without a warrant incident to a lawful arrest); Frank v. Maryland, 359 U. S. 360; Givner v. State, supra (search without a warrant in the interest of the preservation of public health); Carroll v. United States, 267 U. S. 132 (search of movable objects); Armwood v. State, 229 Md. 565 (search of premises by consent).

means of support." The record shows that they had been roving around before they reached Preston Street and had been there but a few days before the homicide occurred. Their hasty "take-off" in the early morning hours after the killing, with the dead body lying a few feet from the window of their blood strewn apartment, without any notification to the police, would justify an inference that neither appellant intended to return thereto, and both would be very glad if they were never thereafter recognized as the former occupants thereof. Furthermore by their own admissions, they decided (somewhere around 3:00 a.m.,) to leave town, and, after purchasing clothing, they were driven by private car to Washington, where they took a bus to a point in Virginia, where they were to rendezvous with Mr. Buettner and "all leave together."

The factual situation here is quite similar to that in *Feguer v. United States,* 302 F. 2d 214 (C. A. 8, 1962). There, the defendant, prior to committing a kidnap-murder, had rented a room in a rooming house, and paid seven days' rent in advance. On the fourth day, he kidnapped a local doctor, whom he had lured to the room on the pretense of his having an ill wife; and, using the doctor's car, drove from Dubuque, Iowa, to Illinois, where the doctor was shot and killed. The murderer returned to Dubuque, went to the rooming house, packed his bags and left for Gary, Indiana. The following day, the police traced the missing doctor to the rooming house, and then, with the permission of the landlord but without a warrant, searched the room. At the time of the search, the accused was entitled to two days' occupancy under his seven-day lease; and the police were unaware that he had fled. The search revealed criminative evidence, which was introduced, over objection, at his trial. The Court, in a carefully reasoned opinion, held that the search and seizure were valid and the evidence admissible, because the accused had abandoned the premises (even though his rent period had not expired) and discarded certain items of personal property. To like effect, see *Abel v. United States,* 362 U. S. 217.

We hold that the search and seizure in the case at bar were legal and valid, and the evidence objected to was properly admitted into evidence.

## II

The appellants claim an insufficiency of evidence to find them guilty of first degree murder. We set forth the evidence, in some detail, above. It is obvious that the trial judge from the evidence and the legitimate inferences to be drawn therefrom, could fairly find beyond any reasonable doubt that both appellants participated in the killing of Shipley while perpetrating a robbery; and, as we pointed out above, the statute makes such a killing murder in the first degree.[4] It would, we think, be superfluous to repeat the evidence; we hold that it was sufficient to support the findings of Judge Harlan.

*Judgments affirmed.*

---

4. Thomas v. State, 206 Md. 575, 112 A. 2d 913; Shockley v. State, 218 Md. 491, 148 A. 2d 371; Boblit v. State, 220 Md. 454, 154 A. 2d 434; Thompson v. State, 230 Md. 113, 186 A. 2d 461.