# DAVIS *v.* STATE

[No. 25, September Term, 1964.]

*Decided October 22, 1964.*

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*John F. McAuliffe,* with whom were *Robert C. Heeney* and *Heeney & McAuliffe* on the brief, for the appellant.

*Robert L. Karwacki, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Leonard T. Kardy* and *Charles Foster, State's Attorney* and *Assistant State's Attorney,* respectively, *for Montgomery County,* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court. HAMMOND, J., dissents. Dissenting opinion at page 399, *infra.*

Walter Clyde Davis, Jr., appellant, was convicted of manslaughter by a jury in the Circuit Court for Caroline County. The indictment was for murder. However, the court granted the appellant's motion for judgment of acquittal of murder in the first degree, submitting to the jury the remaining degrees of homicide. He was sentenced to the Maryland Penitentiary for five years, and appeals from the judgment and sentence.

On July 2, 1963, Davis, a thirty-eight year old mechanic, resided with his mother, Bessie L. Davis, at 6117 Madawaska Road in Montgomery County, Maryland. This property had been for sale for some time and the electric service had been turned off, and the only illumination provided during the nighttime in the property was by a kerosene lantern. On that morning the appellant awakened after his mother left for work, and after drinking five or six bottles of beer, did an auto repair job in Malman Hills, a residential neighborhood close by his home.

After completing this work he proceeded to the home of Harvey Roberts and the latter's mother, for the purpose of performing some grass cutting chores at their residence. When he had finished these chores, between 3:00 p.m. and 4:00 p.m. that day, he waited at the Roberts' residence for Harvey Roberts to return from work so that he could use the latter's car to return his grass cutting equipment to his home. This was done, and after dropping the equipment off at 6117 Madawaska Road, Harvey Roberts left the appellant near the Hill Top Tavern, located in Glen Echo Heights, at about 6:00 p.m. There the appellant drank some beer and then proceeded to a liquor store on McArthur Boulevard where he bought a half-pint of whiskey and a bottle of wine. Leaving the liquor store he stopped at a nearby park where he consumed the bottle of whiskey and then returned to the Hill Top Tavern at about 8:00 p.m. Davis had planned to meet his mother at the tavern where she was to stop on her way home from work.

He continued to drink beer at the Hill Top tavern, where he met Robert P. Moline (alias Jack Moline), with whom he had not been acquainted previously. Davis testified that after returning to Hill Top and continuing the consumption of alcohol, he felt "fuzzy" and only "vaguely" recalled leaving the tavern. From the testimony of witnesses other than Davis it appears that these two went to appellant's home in a taxicab between 8:30 p.m. and 9:00 p.m. About 9:45 p.m. that evening the appellant's mother arrived home. She testified that she saw no one but her son in the house. At 10:45 p.m., after drinking one beer with him, she went to sleep in her second floor room. Davis remained downstairs, since he customarily slept on a couch on the first floor. About 3:45 a.m., on the following morning, while she was in the course of dressing for work, Mrs. Davis heard a commotion outside of the house, but she continued dressing and left the house at 4:30 a.m. for the purpose of boarding a bus which would take her to her place of employment.

The appellant testified that some time after his mother arrived home on July 2 and retired for the evening to her second floor bedroom, he went to sleep on the couch on the first floor. He was aroused some time during the night by "somebody

trying to get in bed with me," and to take his trousers off. In describing his reaction to this, he stated: "I think I raised straight up in the bed and started swinging * * * I hit something." His trousers in which he had been sleeping had been pulled down below his knees, causing him to stumble as he jumped out of bed. He recalled scuffling with the person who had tried to get into bed with him but denied any further knowledge concerning the incident.

On July 3, 1963, Issac H. Moore, Jr., who had been employed as a real estate broker for the sale of the property occupied by the appellant and his mother, stopped at 6117 Madawaska Road at about noon and noticed that the "For Sale" sign which was supposed to have been placed on the premises was not present. He and his secretary, who had accompanied him on this visit to the property, walked to the rear yard of the premises in the hope of finding the real estate sign. In the back yard they observed a body which was lying under a pile of debris made up basically of automobile parts. Next to where the body was lying was a shallow hole "perhaps five to six feet long and a couple foot wide, approximately three or five inches deep." They concluded that the person that they found was dead and, without disturbing any of the debris which covered the body, immediately notified the Glen Echo Fire Department, which was close by the property. The department personnel responded to the message received from Mr. Moore within ten minutes. Lt. Denell of the Montgomery County Police Department was present at the fire house when Mr. Moore reported finding the dead body, and even though the lieutenant was off duty at the time, he proceeded to the Davis premises with the firemen. They arrived at approximately 12:20 p.m. and were shortly thereafter joined by Officer Wisda of the Montgomery County Police.

A preliminary investigation of the scene disclosed the dead body of a person later identified as Jack Moline, who was known to be an overt homosexual. The body was lying under a pile of automobile parts and other debris, and it appeared that the person had been dead for some time. Close to the body lay a long-handled shovel and a pick. There was a discernible trail of blood and scuffed grass leading from the place where

the body was found to the back porch of the property and to the back door. The body lay seventy-one feet from the back steps of the house. Severe lacerations and contusions about the head and trunk of the body were apparent and, in the opinion of the pathologist who examined the deceased on July 3, at 2:30 p.m., were the cause of death. The same pathologist also noted that the blood test conducted on the deceased demonstrated that he was intoxicated at the time of his death. The fly on the pants worn by the deceased was unzippered and his private parts were partially exposed.

A few minutes after his arrival on the scene, Lt. Denell walked from the back yard where the deceased had been found to the front of the house, where he knocked on the door. Receiving no response, he looked in the window located to his left as he faced the door and noticed a pair of human feet; his further view was blocked by a partition within the house. He reported what he had observed to the firemen and to Officer Wisda as he returned to the back yard. Together with Officer Wisda and Lt. Arnold of the Glen Echo Fire Department, Lt. Denell went to the back steps of the house from where blood stains could be observed on the back porch, which was enclosed by screening, the door to which was latched. A small sledge hammer was seen on the porch. The screen on the door to the porch was forced and the door unlatched whereupon, led by Officer Wisda, who was in uniform and armed, Lt. Denell and Lt. Arnold entered the enclosed back porch and went into the house through an unlocked kitchen door.

When the officers went through the kitchen to the adjoining dining room they found the appellant, whose feet had been observed through the front window, sleeping on a couch, and aroused him. Bloodstains were apparent on the sheet upon which he was sleeping and the condition of the interior of the house indicated that a struggle had taken place. They thereupon placed him under arrest and conducted a search of the premises.

Following the arrest the police seized items which were later placed into evidence at the trial of the appellant. They were a sheet from defendant's bed, shoes found in the dining room, cotton print material from a clothes hamper, a section of the

baseboard cut out of the kitchen wall, and a piece of rug cut from the dining room floor. Items smeared with blood were taken from the back yard and back porch of the premises. These were the pick and shovel taken from the yard near the body, a sledge hammer found on the back porch, a hatchet found in a tool box located outside the house, and blood specimens taken from the back yard and back porch of the premises. All of these items, together with an empty Pall Mall cigarette package and a pair of socks hereinafter mentioned, were submitted to the Federal Bureau of Investigation for analysis. The Bureau's report indicated that human blood was found on each of said items examined which was of the same general type as the blood of the deceased.

The appellant was removed to the Montgomery County police station at Bethesda, and his interrogation by the police began at about 4:00 p.m. of the same day. A warrant was obtained and read to him at 4:30 p.m., charging him with murder of Robert P. Moline. They talked to him on several occasions that day until midnight. During this time an empty Pall Mall cigarette package and a pair of socks then worn by the appellant were taken from him and later admitted into evidence at the trial.

Interrogation was continued for a short period at 3:15 p.m. on July 4. On that occasion he recalled that he was very intoxicated when he left the Hill Top Tavern between 8:30 p.m. and 9:00 p.m. on July 2. He remembered awakening during that night thinking he had "done something awful but couldn't remember what it was." After these statements he was taken to the County Detective Building in Rockville. On July 5 at 8:00 a.m. he was again interrogated and recalled someone trying to get in bed with him during the night of July 2 or early morning of July 3. He remembered striking this person and jumping out of bed, and noticing that when he did his pants or underwear were down around his knees, causing him to fall. On being told about the hatchet which was found on the premises, he advised the officers that the hatchet was ordinarily kept in a chest of drawers on the first floor of the house, and suggested that if he had wanted a weapon, the hatchet would have been what he would have used. He also related that he had a morbid

hatred of homosexuals which he ascribed to an attack upon him by such a deviate when he was a boy.

On this appeal the appellant contends:

I, that the Montgomery County police did not have reasonable grounds to believe that appellant had committed a felony so as to make his arrest without a warrant lawful;

II, that the physical evidence obtained from appellant's house was the result of an illegal search and seizure;

III, that the oral statements made by the accused to the police after his arrest were improperly admitted into evidence; and

IV, that the evidence was insufficient to convict him of the crime of manslaughter.

### I and II

In measuring the reasonableness of the entry on July 3 of the police officers upon the curtilage at 6117 Madawaska Road and into the house located thereon in which the appellant was found and arrested, we of course recognize the general rule that a search of private premises should be pursuant to a legally issued warrant. *Agnello v. United States,* 269 U. S. 20 (1925), cited in *Buettner v. State,* 233 Md. 235, 239, 196 A. 2d 465. However, the courts recognize exceptions to this general rule, one of which is an entry made during an emergency situation. In considering the entry upon the Davis' property it is clear that the police were acting in pursuance of their duty to investigate a reported death. Thus, the status of these officers upon the curtilage of the property was not that of trespassers. Furthermore, in light of the gory scene which confronted the police in the back yard of the Davis' home, their duties with regard to investigation of the death of the person found there commanded that they determine whether more than one person had been victimized in the carnage which had obviously taken place.

We find that the entrance of the police officers into the house was reasonable under the circumstances then existing in order to determine whether the feet which were seen therein by Lt. Denell were those of a person in distress, immediate aid to whom might, under similar circumstances, have preserved a human life. Basic humanity required that the officers offer aid

to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard. The delay which would necessarily have resulted from an application for a search warrant might have been the difference between life and death for the person seen exhibiting no signs of life within the house. The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house. As aptly stated by Judge Burger in *Wayne v. United States,* 318 F. 2d 205, 212 (1963) :

> "Breaking into a home by force is not illegal if it is reasonable in the circumstances. * * * But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' referred to in *Miller v. United States,* [357 U. S. 301, 2 L. Ed. 2d 1332 (1958)] e. g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within."

See also *People v. Roberts,* 303 P. 2d 721 (Cal. 1956).

We find no error in the search of the house and the seizure of the evidence therein. Finding the person in the house was not in distress, the officers were justified in observing the condition of the interior of the house, the appellant lying on what appeared to be a blood stained bed sheet inside a room which showed demonstrable evidence of a bloody struggle, and from which house a trail of blood led to a body brutally beaten to death. *United States v. McDaniel,* 154 F. Supp. 1, (D. C. 1957). At this time the officers became possessed of that degree of knowledge sufficient to warrant them in the reasonable belief that the appellant had committed the felony which caused the death of the man in the back yard. *Braxton v. State,* 234 Md. 1, 197 A. 2d 841; *Shorey v. State,* 227 Md. 385, 177 A. 2d 245.

Immediately following the appellant's arrest, certain items which were in plain view were seized, including the pick and shovel lying near the deceased's body, the sledge hammer on the back porch, the appellant's shoes lying on the floor of the room where the arrest took place, items smeared with blood inside the house, and blood specimens taken from the back yard and from the back porch. This tangible evidence of the crime being investigated was properly seized as an incident to the arrest of the accused. *Edwardsen v. State,* 231 Md. 332, 190 A. 2d 84. Also, the officers conducted a search of the house following the arrest and from a hamper in the bathroom, located next to the room in which the appellant was arrested, took certain clothing. We hold that this search was within the limits of the areas within the control of the appellant and justified the seizure of the evidence. *Matthews v. State,* 228 Md. 401, 179 A. 2d 892; *Griffin v. State,* 200 Md. 569, 92 A. 2d 743. The hatchet admitted in evidence was found in a tool box located on the side of the house and, therefore, necessarily close to the point where the victim of this homicide was found. Since the perpetrator of this crime used the curtilage of the house, as well as the interior thereof, for his illegal activity, we find that this search was justified as incidental to the arrest of the accused. *Gault v. State,* 231 Md. 78, 188 A. 2d 539; *Rucker v. State,* 196 Md. 334, 76 A. 2d 572. Likewise, the empty cigarette package and clothing taken from the appellant after his

transportation to the Bethesda police station were products of a reasonable search incidental to his arrest since there is no claim that any of these items were not on his person at the time of his arrest. *Edwardsen v. State, supra.*

## III

The appellant argues that the oral statements made by the accused to the police after his arrest were improperly admitted into evidence. The record supports the finding that the admissions made by Davis, while being interrogated by the Montgomery County police following his arrest, were freely and voluntarily made and were not produced as the result of any threats, promises, or inducements. Davis was questioned for intermittent periods between 4:00 p.m. and midnight on July 3, and for a fifteen minute period on July 4, when he told the officers that he had awakened during the night of July 2, or early morning of July 3 and "thought he had done something awful." During the interrogation of July 5 he admitted to the officers he had struck someone during the night, and that he kept a hatchet in his room and that if he wanted a weapon, he thought the hatchet would have been what he would have used. Davis makes no claim that he requested the services of an attorney at any time during this interrogation. Under these circumstances the admissions meet the requirement of voluntariness. *Mefford and Blackburn v. State,* 235 Md. 497, 201 A. 2d 824; *Bean v. State,* 234 Md. 432, 199 A. 2d 773; *Stewart v. State,* 232 Md. 318, 193 A. 2d 40.

## IV

The evidence before the lower court, together with the reasonable inferences properly drawn therefrom, permitted the jury's finding that the appellant unlawfully killed Robert P. Moline without malice aforethought. *Connor v. State,* 225 Md. 543, 171 A. 2d 699; *Bruce v. State,* 218 Md. 87, 145 A. 2d 428. The appellant was seen on July 2 with the deceased at the Hill Top Tavern shortly before his death. *Breeding v. State,* 220 Md. 193; 151 A. 2d 743. Not long thereafter, the appellant was seen near his home with a man answering the deceased's description between 8:30 p.m. and 9:00 p.m. *Buettner*

*v. State, supra; Kier v. State,* 216 Md. 513, 140 A. 2d 896. The blood found inside the house corresponded with the blood type of the victim. *Shorey v. State, supra.* The appellant, following his arrest, stated that he had repelled by force an attempt by someone to get into bed with him at a time when he had available near his bed a hatchet capable of being used as a weapon. The circumstantial evidence supporting the appellant's use of that weapon on the deceased was abundantly sufficient to find him guilty of manslaughter. *Brown v. State,* 222 Md. 290, 159 A. 2d 844.

*Judgment affirmed.*

HAMMOND, J., filed the following dissenting opinion.

I dissent for the reason that in my view, the breaking and entering of appellant's house was a violation of his constitutional rights. There was present no reason in the form of emergency or other exception to vary the general rule that the determination of probable cause must be made by a judicial officer rather than a policeman, and evidenced by a search warrant, and, therefore, the arrest and the searches which followed were illegal and the articles found were inadmissible in evidence.