[No. 48121–1.   En Banc.   July 1, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. KAREN
LOUISE LOEWEN, *Petitioner.*

*Karen L. Loewen,* pro se, and *Kenneth L. Jorgensen,* for petitioner.

*Paul Klasen, Prosecuting Attorney,* and *Guy Nelson, Deputy,* for respondent.

STAFFORD, J.—The sole issue is whether appellant's constitutional right to be free of unlawful searches and seizures was violated.

Appellant, Karen Loewen, and her 9–year–old son, Lincoln, were the occupants of a wrecked automobile found in the overrun area of the Grant County Airport. The car was lodged against a dirt bank approximately 200 to 300 yards from the main road. Cleo Brandt, an airport security officer, discovered the car at approximately 11:30 p.m. July 30, 1979. According to Brandt, appellant's lip was cut and bleeding and she was disoriented, as if in shock. She was unable to identify either herself or her child. Brandt looked through a wallet found on the floor of the front seat of the automobile in an effort to determine appellant's identity. He found a concealed weapons permit issued to a Karen Loewen at a specified address, but found no driver's license or photograph.

Officer Brandt radioed the sheriff's office for assistance and Deputy Sheriff Gordon Harris arrived at the scene of the accident within a few minutes. Brandt informed him that the weapons permit was the only identification found. Upon checking the vehicle registration, Harris discovered the vehicle was registered to a person other than the one to whom the weapons permit had been issued. Appellant remained disoriented and apparently unable to disclose her name. Her son, also in somewhat a state of shock, was unable to give the officers his mother's name.

Testimony taken at the suppression hearing reveals that the officers decided to take appellant to the hospital. While assisting her into the patrol car Harris decided a pat–down

search for weapons was advisable because of the concealed weapons permit. Since she was barely able to stand, Harris held her up while Brandt performed the pat–down search. Brandt felt a small (2– by ½–inch) tubular shaped object in appellant's front jeans pocket. As a result he reached in and pulled out what was recognized as a cocaine sniffer. Thereafter, Officer Brandt placed appellant's wallet in her tote bag "right on top" and Officer Harris drove her to the hospital. Lincoln, the son, was left at the scene of the accident with Officer Brandt. After questioning Lincoln for approximately 30 minutes, Brandt learned he had been staying with his grandmother and was directed to her home.

Upon arriving at the hospital, appellant was taken to the emergency room, and her tote bag, containing the wallet, was left at the nurses' station. After a few minutes Deputy Sheriff Harris, who still had been unable to ascertain appellant's name, decided to search the tote bag "to get a positive identification of her". The testimony of the nurse who assisted Harris in the search of the tote bag was equivocal as to the need for an immediate ascertainment of appellant's identity for effective medical treatment. It is clear, however, that Officer Harris, and not the hospital personnel, caused the tote bag to be searched.

Harris testified at the suppression hearing that he "found a plastic baggie with some leafy material in it, right on top of the [tote bag]". As a result he "sort of got curious as to what else might be found in the [tote bag]" and searched it. The wallet was found next and, lastly, Harris unearthed a baggie of phencyclidine (commonly known as "PCP" or "angel dust") and two other baggies containing traces of marijuana. On the other hand, the nurse who assisted Officer Harris with the search testified the wallet "was on the top of the tote bag", where Officer Brandt said he had placed it and that Harris found the wallet *first, i.e.,* before finding any baggies of marijuana.

After searching the tote bag Harris returned to the emergency room and again asked appellant her name. By

that time appellant was better oriented and gave the officer her name. She also asked about her son and requested that her former husband be notified. Upon his arrival about 10 minutes later, Harris gave appellant her *Miranda* warning and placed her under arrest. After receiving 12 stitches in her mouth, appellant was transported to the Grant County Jail. She returned to the hospital the next day to receive treatment for a concussion.

At the suppression hearing the trial court denied appellant's motion to suppress the cocaine sniffer, as well as the marijuana and phencyclidine discovered in her tote bag. At trial the cocaine sniffer and other material removed from the tote bag were admitted. As a result, appellant was convicted of possession of a controlled substance, in violation of RCW 69.50.401 of the Uniform Controlled Substances Act. A divided Court of Appeals affirmed the conviction. We reverse the trial court and the Court of Appeals and remand the cause for a new trial. The trial court erred by denying appellant's initial motion to suppress the evidence and by admitting the drugs in evidence at trial. The evidence was obtained as a result of two unlawful searches and seizures.

The Fourth Amendment provides insofar as pertinent:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .

The Fourth Amendment was made applicable to the states through the due process clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961). Thus searches conducted outside the judicial process are, with but few well–delineated exceptions, per se unreasonable. *Arkansas v. Sanders*, 442 U.S. 753, 759–60, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979); *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *State v. Simpson*, 95 Wn.2d 170, 188, 622 P.2d 1199 (1980). The question before us is whether the searches and seizures in question fall within

one of the limited exceptions.

Both the trial court and the Court of Appeals held the pat–down search was justified. The United States Supreme Court has permitted limited intrusions such as a "stop and frisk" or a "pat–down" search in situations when an officer reasonably apprehends danger. *Terry v. Ohio,* 392 U.S. 1, 20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *see also State v. Hobart,* 94 Wn.2d 437, 441, 617 P.2d 429 (1980). In determining whether such an intrusion is reasonable, we must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* at 20.

The State contends the patdown was performed because appellant possessed a concealed weapons permit and the officers believed appellant might have been armed. We agree that, under the circumstances, an officer might reasonably apprehend danger and that the *patdown* was reasonably related to that concern. Nevertheless, even though the initial patdown was justified it is clear the officers' ultimate intrusion exceeded the actual scope of the search.

The instant search, unlike a search without a warrant incident to a lawful arrest, was not justified by any need to prevent the disappearance or destruction of evidence of crime. *Terry,* at 29. The sole justification of the patdown in the instant case was protection of the police officers from a possible concealed weapon. The ultimate intrusion in such a case must be confined in scope to the exigencies which justify its initiation, however. In short, the ultimate search or intrusion must be one that is "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* at 29; *Warden v. Hayden,* 387 U.S. 294, 310, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967) (Fortas, J., concurring). According to Deputy Sheriff Harris, the initial patdown was "to check for a concealed weapon, if she had a knife or gun or anything like that." Primarily, Harris felt she might have a firearm on her person.

The record from the suppression hearing indicates that when Brandt patted down appellant he felt a small tube of some kind in the front pocket of her jeans. Brandt reached in her pocket and removed a small plastic container which proved to be a cocaine sniffer. It measured approximately 2 by ½ inches, which is about two–thirds the size of an average lipstick container. At the suppression hearing, Brandt testified that in addition to weapons, *he was searching for drug paraphernalia as well.*

Since this was not a search incident to a lawful arrest, the sole justification of the warrantless search was the protection of the officers. It was thus necessary that the ultimate search be confined in scope to an intrusion designed to discover weapons and not drug paraphernalia. The actual size of the tube coupled with Brandt's admitted search for drugs indicates the search was not limited in scope to the discovery of weapons. Thus, the removal of the cocaine sniffer from petitioner's pocket exceeded the reasonable scope of the permitted warrantless search. The cocaine sniffer should have been excluded as evidence. As we said in *State v. Hobart,* 94 Wn.2d 437, 447, 617 P.2d 429 (1980):

> To approve the use of evidence of some offense unrelated to weapons would be to invite the use of weapons' searches as a pretext for unwarranted searches, and thus to severely erode the protection of the Fourth Amendment. Such a step this court is not prepared to take.

Turning next to the marijuana and phencyclidine discovered in the tote bag at the hospital, we have a different exclusionary problem. Since the second search was undertaken without a warrant, we must initially determine whether it falls within some exception to the constitutional mandate prohibiting warrantless searches.

Warrantless searches by police officers have been upheld when an emergent situation has been found to have existed. *State v. Jordan,* 79 Wn.2d 480, 487 P.2d 617 (1971). Specifically, such searches have been upheld when persons were found seriously injured or unconscious and

the search has been completed for the express purpose of finding identification, medical alert cards, or the names of persons to call in case of an emergency. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978); *United States v. Haley,* 581 F.2d 723, 725–26 (8th Cir. 1978); *United States v. Dunavan,* 485 F.2d 201 (6th Cir. 1973); *Root v. Gauper,* 438 F.2d 361, 364–65 (8th Cir. 1971); *United States v. Barone,* 330 F.2d 543, 545 (2d Cir. 1964); *People v. Roberts,* 47 Cal. 2d 374, 303 P.2d 721, 723–24 (1956); *Patrick v. State,* 227 A.2d 486, 488–90 (Del. 1967); *People v. Smith,* 47 Ill. 2d 161, 163–64, 265 N.E.2d 139 (1970); *Guardiola v. State,* 375 N.E.2d 1105, 1110–11 (Ind. 1978); *Davis v. State,* 236 Md. 389, 204 A.2d 76, 80–82 (1964); *State v. Miller,* 486 S.W.2d 435 (Mo. 1972); *State v. Hardin,* 90 Nev. 10, 518 P.2d 151 (1974); *People v. Mitchell,* 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, *cert. denied,* 426 U.S. 953, 49 L. Ed. 2d 1191, 96 S. Ct. 3178 (1976); *State v. Prober,* 98 Wis. 2d 345, 297 N.W.2d 1 (1980). *See also* Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buffalo L. Rev. 419 (1973). As indicated by the foregoing cases, the exigencies created by a medical emergency have been held to justify a warrantless search. Further, items inadvertently discovered while conducting such a search have been deemed admissible.

In order to come within the medical emergency exception, however, we must be satisfied both subjectively and objectively that the search was actually motivated by a perceived need to render aid or assistance. Under *State v. Prober, supra* at 365:

> First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would have thought an emergency existed, the search is invalid.

The State has the burden of establishing that both conditions of the medical emergency exception have been met.

*United States v. Dunavan, supra* at 204; *see also Arkansas v. Sanders, supra* at 760; *Chimel v. California,* 395 U.S. 752, 762, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969).

Applying the foregoing tests to the instant case it is clear the search of the tote bag for identification was initiated by Officer Harris and not by hospital personnel. According to testimony at the suppression hearing, the nurse assisting Harris merely acceded to his request to search. At the time the search was undertaken, petitioner was being treated by trained medical personnel and was beginning to regain consciousness. Reviewing these facts objectively, it was not reasonable for Harris to assume a life–threatening emergency existed so as to justify the warrantless search. Thus, even though Officer Harris may subjectively have perceived a need to search the tote bag, it cannot be said objectively that under the attendant circumstances a reasonable person would have thought an emergency either existed or continued to exist.

Under the facts before us it is clear the State failed to meet its burden of proving a medical emergency existed so as to support Harris' search of the tote bag without a warrant. Since the search was invalid, the contraband discovered during that search should have been suppressed on appellant's motion. Further, the trial court erred by admitting the evidence at trial.

Since we have held an examination of the tote bag was an invalid warrantless search we need not decide whether the evidence obtained thereby was also excludable on the ground that it was discovered through exploitation of the prior illegal search of appellant's pockets or whether it was the product of an independently motivated valid search. *See Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182, 24 A.L.R. 1426 (1920); *State v. O'Bremski,* 70 Wn.2d 425, 423 P.2d 530 (1967).

We reverse the trial court and the Court of Appeals and remand the cause for entry of an order of suppression in

accordance with this opinion and for new trial.

ROSELLINI, UTTER, DOLLIVER, WILLIAMS, DORE, and PEARSON, JJ., concur.

DIMMICK, J. (dissenting)—Officer Harris engaged in two searches, each of which must be separately analyzed. The first, a pat–down search of defendant's person, was made in order to discover whether defendant possessed any weapons. The majority concedes that under the circumstances Officer Harris might have reasonably apprehended danger and that the patdown was related to that concern. Majority opinion, at 566.

I disagree with the majority's conclusion that the search in the instant case exceeded its permissible scope. It was midnight, defendant was disoriented, her car was wrecked in an area where she had no reason to be and a concealed weapons permit was found. The officer instructed Brandt, the airport security officer, to pat her down for weapons. Brandt testified that he felt a hard object in defendant's loose jeans pocket and could not determine what the item was. The object was hard, and by actual measurement, was 2 7/32 inches long by 11/16 of an inch wide. It had a small handle on the side 3/8 of an inch wide, projecting 3/8 of an inch from the container. Officer Harris testified that according to his experience, feeling such an object in a person's pocket would alert him to the fact that it might be a weapon. He asserted in this regard that there are pistols small enough to fit in the palm of a person's hand.

The question is whether there were reasonable grounds to suspect the object was a weapon and thus lawfully remove it from defendant's pocket. The situation was extraordinary and under all the circumstances I would hold that such reasonable grounds existed herein. This is not a case where an officer feels a soft cigarette package in a shirt pocket and removes it on the pretense that he was searching for a weapon. The fact that the object turned out to be a cocaine sniffer does not destroy the lawfulness of the pat–

down search.

The majority relies upon a statement by Brandt that he was looking for drug paraphernalia as well as weapons when he performed the patdown. Such testimony is irrelevant as Brandt was an airport security officer, and not a police officer. Harris was the police officer in charge and his only purpose for the search was to "check for a concealed weapon, if she had a knife or gun or anything like that." Brandt's mental view cannot destroy the primary and permissible justification for the search by Officer Harris. In addition, Brandt's testimony was not as unequivocal as the majority indicates in this regard.[1]

Defendant was convicted of violating the controlled substances act and placed on probation for 3 years without jail

---

[1]During cross examination by defendant's attorney, Brandt testified as follows:

Q Okay, now you patted her down before putting her in the car?
A Right.
Q And, the reason for that was what?
A To search her for any weapons or anything she might injure herself with.
. . .
Q And, you patted her down for weapons, is that correct?
A I searched her for anything that I thought would do anyone any harm, weapons, matches.
. . .
A I wanted to search her before she went in the car for weapons. Well, anything else, because I wouldn't put anybody in the back of anybody's car, even if they were giving them a ride.
Q So now, your testimony is you were not only searching her for weapons, you were searching her for any other— What do you mean by anything else?
A Obviously what turned up, this paraphernalia, or—
Q You were searching her for drugs then?
A I was searching her for anything that would do anybody harm in that car.
. . .
Q And, when you say you searched for things that might do any harm, you're saying that in the connection of them being harmful to one of the officers who was transporting her; isn't that true?
A Or herself. Because if she had any other kind of weapon, she could harm herself.
During redirect examination Brandt testified:
Q Would you say the primary object of your search was to protect the officers that would be transporting her?
A Yes.

time. Defendant was not convicted for possessing the cocaine sniffer. Rather she was convicted for possession of marijuana and phencyclidine found when Officer Harris made a completely separate search of defendant's tote bag at the hospital. Officer Harris' stated purpose in making this second search was to determine defendant's identification and any other information useful in her treatment. Thus, even if the pat–down search was not lawful, the evidence obtained in the second separate search was obtained by means sufficiently distinguishable to be purged of the alleged taint of the pat–down search. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Knowledge of the tote bag's contents was gained through an independent source—the search for identification.

The majority states that the search of the tote bag was initiated by Officer Harris and the hospital personnel merely acceded to his request. I strongly disagree as the relevant testimony of the nurse present when Officer Harris searched the bag indicates otherwise:

Q Okay, are items found in patients' purses sometimes useful at the hospital in deciding how to deal with a patient?

A Um hum.

Q For what kind of reasons?

A Well, if they've been taking prescription medication, sometimes that will affect other medications that we give them.

Q Okay, do people with different kinds of medical conditions sometimes have notice of that fact in their purse?

A You mean like if they're diabetic or something, do they carry something like that, yes.

. . .

Q Well, did you take any part in causing the purse to be searched?

A Because I felt that I needed to know her name and address and some information about her, yes I did.

The majority unnecessarily binds the hands of police officers and possibly hospital personnel in their attempts to determine the identity of a person in need of prompt medical attention. Anyone who has ever attempted to gain admittance to a hospital, even in an emergency, is aware that it is almost an impossibility until identification and medical history have been established, as well as insurance coverage. The majority uses hindsight in its conclusion that because defendant gained consciousness after treatment there was no emergency requiring prompt identification. This ignores the fact that both the officer and the hospital personnel had made inquiries of defendant as to her name while she was being treated. When defendant did not respond, the officer searched her bag for identification. When he made the search there was no indication that defendant would become coherent. As noted by the majority, courts consistently uphold searches made for the purpose of finding identification. Majority opinion, at 567–68. There are many policy reasons for such a result. In addition to medical reasons, family members must be notified.

I conclude that Officer Harris' subjective motive as stated was to render aid or assistance. In addition, upon reviewing all the facts objectively, it was reasonable for Officer Harris to have determined the situation required his attempting to ascertain defendant's identity in this manner. Again, the fact that the officer found marijuana and phencyclidine, as well as defendant's identification, does not destroy the validity of the search. As noted by the majority, items inadvertently discovered while conducting a search for identification are admissible.

In sum, the officer's actions herein were appropriate and necessary. There were no unreasonable searches. The purpose of the exclusionary doctrine—to prevent unlawful police conduct—is not at all served in this case where the officer conducted himself in what appears to me, as it also

appeared to the trial court, and the Court of Appeals, to be a reasonable manner. Therefore, I dissent.

BRACHTENBACH, C.J., concurs with DIMMICK, J.