[No. 26679-9-I. Division One. December 14, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. BILLIE JOE LOWRIMORE, *Appellant*.

*Eric Broman* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Sabrina Housand, Deputy,* for respondent.

FORREST, J. — Billie Joe Lowrimore, a juvenile, appeals her conviction of unlawful and felonious possession of methamphetamine, claiming that the trial court erred in denying her motion to suppress because the officer's detention of Lowrimore and his search of her purse and a smaller bag inside the purse were illegal. We affirm.

On October 26, 1989, Sergeant Russ Olson received a dispatch call concerning a fight between a mother and daughter. The daughter was Lowrimore. The dispatch informed Olson that the daughter was threatening to commit suicide and possessed knives. Lowrimore's parents had called the police.

Olson went to Lowrimore's house and observed her in the backyard. Olson watched her for about a minute until another officer arrived. Olson approached Lowrimore, grabbed her, and asked her to stay outside and talk with him.

Olson testified that when he encountered Lowrimore, she was "very excitable, very upset. And her mood swings, as we went along, seemed to go up and down." Lowrimore told Olson that she did not try to kill herself that day.

After Olson grabbed Lowrimore, her parents came out of the house. Her mother informed Olson that she and Lowrimore had an argument and that her daughter was very emotional and upset. Her mother also informed Olson that Lowrimore had in the past threatened to harm herself and that "that was implied again . . . while they were arguing."

The parents told Olson that Lowrimore possibly had some weapons.

Olson could not recall whether he patted Lowrimore down. He thought that perhaps she had been wearing a coat and that he checked the pockets, but could not accurately recall.[1]

Olson directed the other officer to take control of Lowrimore and took custody of her bag and purse. He testified that he did so to ascertain whether the bag and purse contained any knives that Lowrimore would be able to grab. Olson found books in the bag. He found three knives, drug paraphernalia, marijuana pipes, and a set of scales in the purse. The smallest knife was approximately 3 inches long. Olson searched the purse further and found "a blue zip-up bag" inside. Olson searched that bag and found a small baggie containing a substance he suspected to be methamphetamine. Olson testified that he searched the smaller bag because it was big enough to conceal a knife.[2]

Olson then advised Lowrimore that she was under arrest for the possession of narcotics and shortly thereafter took her to the police station. Before he left the premises, Olson gave Lowrimore's purse to her mother.

Olson advised Lowrimore of her *Miranda* rights at the police station and she advised Olson that she understood her rights. Olson then asked her if she had taken any of the methamphetamine and Lowrimore admitted to using some of the drug that day.

Lowrimore was charged with the unlawful and felonious possession of methamphetamine. Lowrimore filed motions to suppress. At a fact-finding hearing, the court denied the motions to suppress the evidence seized as well as Lowri-

---

[1] Olson testified: "I don't recall patting her down. . . . I can't remember if she was wearing a coat. I want to say she was, and I [made] sure there was nothing in those pockets, but that's as far as it went." He also testified, "I recall maybe something real brief to make sure that — again, I think she was wearing a coat. So I wanted to make sure there was nothing in the coat. But I don't recall going past that."

[2] For purposes of clarity, the smaller bag found inside Lowrimore's purse will be referred to as the pouch.

more's statements to Olson at the police station and, on stipulated facts, found Lowrimore guilty as charged.

## DETENTION

Lowrimore contends her detention was unlawful because Olson lacked reasonable cause to believe she was suffering from a mental disorder and she did not present an imminent likelihood of serious harm to others or herself. We disagree.

The State first contends that we should not consider this issue because Lowrimore did not take exception to the court's discussion of the propriety of the detention. Additionally, the State argues that the requirements of RCW 71.05.150(4)(b) were met and the detention was lawful.

■ During the fact-finding hearing, Lowrimore's counsel indicated that she objected to both the stop and the search.[3] However, even if the State is correct in asserting that Lowrimore did not raise the issue of the propriety of the detention before the trial court with sufficient clarity, she can raise it for the first time on appeal pursuant to RAP 2.5(a)(3).[4]

> [A]nalyzing alleged constitutional error raised for the first time on appeal involves four steps. First, the reviewing court must make a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, the court must determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis.

*State v. Lynn,* 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

■ First, the alleged error — the unlawfulness of the detention — clearly suggests a constitutional issue. Second,

---

[3]"And your Honor, I suppose for the record, our argument as to the 3.5 issue is that the stop and search were illegal."

[4]"[A] party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right." RAP 2.5(a)(3).

the alleged error had practical consequences in the trial of the case. That is, if the court had ruled the detention illegal, then the evidence seized pursuant to the stop would likely have been suppressed. Therefore, the merits of the constitutional issue should be addressed even if Lowrimore did not raise it below. The statutory background may be summarized as follows. RCW 71.05.150 provides in pertinent part:

> A peace officer may, . . . take or cause such person to be taken into custody and immediately delivered to an evaluation and treatment facility:
>
> . . . .
> When he has reasonable cause to believe that such person is suffering from a mental disorder and presents an imminent likelihood of serious harm to others or himself or is in imminent danger because of being gravely disabled.

RCW 71.05.150(4)(b).

"Such person" as that term is used in the statute above, refers to a person who "presents, as a result of a mental disorder, a likelihood of serious harm to others or himself, or is gravely disabled." RCW 71.05.150(1)(b).

As used in the statute, "mental disorder" means "any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions". RCW 71.05.020(2). "Likelihood of serious harm" means either:

> (a) A substantial risk that physical harm will be inflicted by an individual upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others[.]

RCW 71.05.020(3).

■■ The background information that Officer Olson had been given, together with his personal observation of Lowrimore's highly unstable and fluctuating emotional state, made it reasonable for him to conclude that she was suffer-

ing from some sort of "mental disorder" as that term is defined in RCW 71.05.020(2) and the information as to her possession of knives justified Olson's reasonable belief that there was an imminent likelihood of serious harm.

Lowrimore's principal contention on this issue is that a reasonable belief of an "imminent likelihood of serious harm" is an insufficient basis for detention unless the officer also has information of a recent overt act which demonstrates "a substantial risk [of] physical harm." In support of this argument, Lowrimore cites *In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982).

Lowrimore's reliance on *Harris* is misplaced. The *Harris* court addressed the constitutionality of the involuntary detention provisions contained in RCW 71.05.150 which permit a 72-hour detention of a person who presents a "likelihood of serious harm to others or himself". RCW 71.05-.150(1)(a). The appellant in *Harris* argued, based on *Suzuki v. Yuen*,[5] that the likelihood of serious harm had to be "imminent" in order to justify involuntary detention. The *Harris* court rejected that contention and held that a showing "of a substantial risk of physical harm as evidenced by a recent overt act" sufficed. *Harris*, at 284. This was treated as a lesser requirement than a showing of an imminent likelihood. Plainly, if "imminent likelihood of serious harm" is sufficient for a 72-hour involuntary commitment under RCW 71.05.150(1), a fortiori, it is sufficient to justify the officer detaining an individual so that the individual may be "immediately delivered to an evaluation and treatment facility" pursuant to RCW 71.05.150(4).

The *Harris* court held that in a *nonemergency* detention, a showing "of a substantial risk of physical harm as evidenced by a recent overt act" was required to justify the detention. *Harris*, at 284. The *Harris* court's holding should properly be limited to the context in which it arose, namely, involuntary commitments in nonemergency situations. To require evidence of an overt act in the context of an emergency situa-

---

[5]617 F.2d 173 (9th Cir. 1980).

tion would defeat the purpose of distinguishing nonemergency from emergency situations. In a nonemergency situation, it is reasonable to conclude that a mental health professional has had one or more opportunities to observe or secure information about the allegedly mentally ill person. In an emergency situation, however, such as the one confronting Olson, it is likely that the officer has never before encountered the person. It would be nearly impossible for the officer to point to a prior overt act to support his detention. In an emergency situation, the statute requires an officer to have reasonable cause to believe an individual presents an *imminent* likelihood of serious harm; this requirement is sufficient to ensure that the person's liberty interests are protected, while still permitting the officer to protect the person, himself, and others from harm.

Olson's detention of Lowrimore was proper.

### SEARCH OF THE PURSE

■ Lowrimore asserts that the warrantless search of her purse was beyond the scope of a *Terry* stop and, hence, the evidence must be suppressed. We disagree. While the criminal law of search, seizure, and arrest may be helpful by way of analogy in analyzing the validity of searches incident to civil detention, there is a basic difference between criminal detentions and civil detentions and, therefore, the rules of the former do not routinely apply to the latter. Specifically, the basis of a *Terry* stop is the reasonable suspicion of criminal activity and the justification for the search is the protection of the officer.[6] On the other hand, the basis of a civil detention pursuant to RCW 71.05.150(4)(b) is "reasonable cause to believe that [the detainee] presents an imminent likelihood of serious harm to others or himself[.]" The purpose of the search impliedly authorized by the statute is the protection of others, not limited to the officer in ques-

---

[6]*Terry* permits an officer to: "briefly detain for limited questioning a person whom he reasonably suspects of criminal activity and . . . frisk the person for weapons, provided the officer has reasonable grounds to believe that he is armed and dangerous." *State v. Hobart*, 94 Wn.2d 437, 441, 617 P.2d 429 (1980).

tion, and often, as in the case before us, primarily for the protection of the individual detained. Accordingly, we do not find the limitations on a pat down incident to a *Terry* stop controlling.

■ Rather, this case is controlled by the well established "emergency situation" exception to the warrant requirement in the area of noncriminal investigations and action.[7] *State v. Lynd*, 54 Wn. App. 18, 771 P.2d 770 (1989).

The *Lynd* court formulated the rule for the emergency exception as follows:

> In order for a search to come within the emergency exception, we must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search and instead was "actually motivated by a perceived need to render aid or assistance." [*State v.*] *Loewen*, 97 Wn.2d [562,] at 568 [, 647 P.2d 489 (1982)]. To that end, the State must show that: (1) the searching officer subjectively believed an emergency existed; and (2) a reasonable person in the same circumstances would have thought an emergency existed. *Loewen*, 97 Wn.2d at 568; . . . In addition, there must be some reasonable basis to associate the emergency with the place searched.

(Citations omitted.) *Lynd*, at 21.[8]

---

[7]For analytical clarity it is essential to distinguish between "exigent circumstances" which, in the context of a criminal investigation will sometimes dispense with the warrant requirement where probable cause exists and the "emergency exception" which will excuse the warrant requirement in noncriminal areas where the officers are acting in the noncriminal, community caretaking function of preserving lives and property.

[8]The court in *Lynd* summarized the background for the emergency exception rule as follows:

> An emergency situation, however, can justify a warrantless search. 2 W. LaFave, *Search and Seizure* § 5.4(c) (2d ed. 1987). For example, when premises contain persons in imminent danger of death or harm; objects likely to burn, explode or otherwise cause harm; or information that will disclose the location of a threatened victim or the existence of such a threat, police may search those premises without first obtaining a warrant. Utter, *Survey of Washington Search and Seizure Law: 1988 Update*, 11 U. Puget Sound L. Rev. 411, 538-39 (1988); *see State v. Loewen*, 97 Wn.2d 562, 568, 647 P.2d 489 (1982) (medical emergency); *State v. Downey*, 53 Wn. App. 543, 544-45, 768 P.2d 502 (1989) (overpowering ether odor); *State v. McAlpin*, 36 Wn. App. 707, 716, 677 P.2d 185 (search for missing gun), *review denied*, 102 Wn.2d 1011 (1984); *see also State v. Bakke*, 44 Wn. App. 830, 833-34, 837-38, 723 P.2d 534 (1986) (burglary in progress), *review denied*, 107 Wn.2d 1033 (1987); *State v. Nichols*,

A warrantless search is reasonable in an emergency situation if: "(1) the officer [was] motivated by a perceived need to render aid; and (2) a reasonable person under the circumstances would have thought an emergency existed." *State v. Cahoon*, 59 Wn. App. 606, 608, 799 P.2d 1191 (1990), *review denied*, 116 Wn.2d 1014 (1991). Once these two conditions are met, "officers may make warrantless searches and the resulting evidence will be admissible". *Cahoon*, at 608. Most of the cases have addressed warrantless searches of premises rather than of persons. However, we perceive no difference for this purpose and apply the same test.

The testimony showed that Olson subjectively believed an emergency existed. His belief was objectively reasonable given the circumstances. Lowrimore was observed to be emotionally unstable; her parents indicated she threatened suicide and was carrying knives. A reasonable person would have thought an emergency existed. A reasonable person would also have thought it reasonable to search Lowrimore's purse for weapons in order to protect the safety of those present, including Lowrimore.

The search of the purse was justified.

## SEARCH OF THE POUCH

Arguably, the search of the pouch might be justified as merely a continuation or extension of the original search of the purse incident to a civil detention. The scope of such search must be limited to a good faith attempt to deal with the problem at hand: here, suicide threats. The pouch could easily have contained a razor blade or drugs, either of which could be used, and frequently have been used, in suicide attempts. However, the State did not urge this argument

---

20 Wn. App. 462, 465-66, 581 P.2d 1371 (1978) (fight in progress reported); *State v. Sanders*, 8 Wn. App. 306, 310-11, 506 P.2d 892 (1973) (entry in response to emergency call and officer's observation of suspicious activity). *State v. Lynd*, 54 Wn. App. 18, 20-21, 771 P.2d 770 (1989).

The same analysis has continued to be applied, *State v. Barboza*, 57 Wn. App. 822, 790 P.2d 647, *review denied*, 115 Wn.2d 1014 (1990); *State v. Swenson*, 59 Wn. App. 586, 799 P.2d 1188 (1990); *State v. Cahoon*, 59 Wn. App. 606, 799 P.2d 1191 (1990), *review denied*, 116 Wn.2d 1014 (1991).

but attempts to justify Olson's search of the pouch on the basis that the search was necessary to locate an additional knife. In light of the nature of the pouch, easily explored by touch, and the equivocal nature of the officer's testimony in this regard, we find the contention unpersuasive.

■■ In any event, it is unnecessary for us to explore the limits of the original search on these facts. Once the officer found the drug paraphernalia in the purse, he had probable cause to arrest for violation of RCW 69.50.412.[9] RCW 69.50-.412 does not, ipso facto, make possession of drug paraphernalia a crime. The statute does, however, criminalize the use of drug paraphernalia to, *inter alia*, "ingest, inhale, or otherwise introduce" a controlled substance into the body. RCW 69.50.412(1). We believe that possession of paraphernalia, coupled with bizarre and emotionally unstable behavior such as that exhibited by Lowrimore, gives rise to probable cause to arrest for violation of RCW 69.50.412(1).[10] As an incident to arrest, Olson had authority to search Lowrimore. Former distinctions and uncertainties as to the scope of a search incident to arrest of various containers such as purses, briefcases and backpacks once they were in the officer's control,

---

[9]Under RCW 69.50.412(1), "[i]t is unlawful for any person to use drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance. Any person who violates this subsection is guilty of a misdemeanor."

[10]An officer is authorized to arrest a person whom the officer has probable cause to believe is committing or has committed a misdemeanor or gross misdemeanor involving the use or possession of cannabis. RCW 10.31.100(1).

Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed.

*State v. Gluck*, 83 Wn.2d 424, 426-27, 518 P.2d 703 (1974).

The determination [of probable cause to arrest] will rest on the totality of facts and circumstances within the officer's knowledge at the time of the arrest. The standard of reasonableness to be applied takes into consideration the special experience and expertise of the arresting officer.

(Citation omitted.) *State v. Fricks*, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979).

have been eliminated by *State v. Smith*, 119 Wn.2d 675, 681, 835 P.2d 1025 (1992), in which the court stated the rule as follows:

> An object is, therefore, within the control of an arrestee for the purposes of a search incident to an arrest as long as the object was within the arrestee's reach immediately prior to, or at the moment of, the arrest.

No exigent circumstances are required for such search,[11] nor is the subjective intent of the officer controlling. If, as a matter of fact, there were grounds justifying the search, the evidence need not be suppressed because the officer was unclear or even acted on an incorrect basis.[12] Under the circumstances, it is also immaterial whether the search took place immediately before the arrest or immediately following the arrest.[13] Accordingly, the search of the pouch was justified as incident to the arrest of Lowrimore for possession of drug paraphernalia in what, at that point, became a criminal investigation. The only objection to Lowrimore's statements to the officer at the station is based on the claimed illegality of the detention and search. In view of our holding on these issues, the statements were properly admitted. We find no error in the denial of Lowrimore's motion to suppress.

Affirmed.

PEKELIS and BAKER, JJ., concur.

Reconsideration denied January 28, 1993.

---

[11]*State v. Smith*, 119 Wn.2d 675, 680, 835 P.2d 1025 (1992).

[12]*See, e.g., State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981) (an experienced officer's misidentification of a tomato plant as marijuana did not negate probable cause to support issuance of a search warrant); *see also Illinois v. Rodriguez*, 497 U.S. 177, 186, 111 L. Ed. 2d 148, 110 S. Ct. 2793, 2800 (1990) (" 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.' ") (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949)).

[13]*State v. Brantigan*, 59 Wn. App. 481, 798 P.2d 1176 (1990).