[Cite as *State v. Hawks*, 2019-Ohio-2350.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO

    Plaintiff-Appellant

v.

JEREMY W. HAWKS

    Defendant-Appellee

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 28238

Trial Court Case No. 2018-CR-2946

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . .

O P I N I O N

Rendered on the 14th day of June, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301
West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellant

PETER CERTO, JR., Atty. Reg. No. 0018880, One South Main Street, Suite 1590,
Dayton, Ohio 45402
    Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, J.

{¶ 1} The State of Ohio appeals, pursuant to R.C. 2945.67(A) and Crim.R. 12(K), from the trial court's decision and judgment entry sustaining defendant-appellee Jeremy W. Hawks' motion to suppress evidence.

{¶ 2} The State advances two assignments of error. First, it contends the trial court erred in finding no common authority held by a co-inhabitant to allow officers to enter and search a residence where incriminating evidence was found. Second, it claims the officers had a "good faith basis" to enter an upstairs bedroom where the evidence was located.

{¶ 3} The present appeal stems from a complaint Dayton police officers received about Hawks allegedly selling drugs from a house he shared with James Sisco, the owner of the residence. The underlying facts are based on suppression hearing testimony from Dayton police officer Kevin Johnson and Hawks, who were the only two witnesses. Those facts, as found by the trial court, were summarized in its December 19, 2018, Decision, Entry, and Order as follows:

> On July 26, 2018, Dayton police officers, Kevin Johnson and Brandon Cartee, were dispatched to 1782 Tuttle Avenue, Dayton, Ohio, to meet a person known as James Sisco, who had called the police about a person living at Sisco's house who was involved with drugs. The officers arrived there at approximately 5:25 p.m., but the caller, James Sisco, was not there. The officers found out that Sisco had been arrested on an outstanding warrant and would not be able to meet with them.
>
> The officers decided to approach the house to conduct a "knock and advise" by knocking on the door and attempting to obtain consent to enter

and search. They found a male outside the residence "grilling." The residence is depicted in Exhibit 1. They approached the person and asked if Jeremy Hawks lived there. The individual, Dana Ray, told him he did and that he was inside the house. The officers asked Ray if they could enter the house and find Hawks and requested that Ray sign a police form consenting to search the residence. Exhibit 11. The police officers knew that Ray was not the owner of the residence but since he told them he lived there also they accepted his authority as consent to enter the house. Ray told them he did not know where Hawks was in the house. The officers did not inquire of Ray as to where he lived in the residence, where Hawks lived, and whether he had common use of the area where Hawks lived. They made no inquiry from Ray as to his actual or apparent authority to permit entry into the house and/or to search the premises or any part of the premises.

The officers entered the residence through a side door into the kitchen area. The side door is depicted in Exhibit 2. They saw two people sitting on a couch. The couch is depicted in Exhibit 3. They asked the two unknown persons where Hawks was and they pointed upstairs. The police officers then proceeded up the stairs, depicted in Exhibits 4 and 5 and 6. There was a doorway at the top of the stairs partially covered by a sheet or curtain. It did not have a separate door. Officer Johnson stated he heard a female and a male voice. He did not announce his presence or ask to enter. He peered into the area that he recognized as a bedroom area and proceeded through the doorway into the room where a female was lying on

a bed and a male was standing by the bed, both naked. The police asked the male if he was Jeremy Hawks and he answered yes. Officer Johnson asked Hawks for his I.D., and Hawks walked toward a dresser to get his I.D. in his wallet. At that time Officer Johnson stated he saw a plastic baggie on the dresser containing a crystalline substance which he believed to be methamphetamine. Hawks pulled on his pants.

Sgt. Beane came upstairs into the bedroom, handcuffed and arrested Hawks. The police searched Hawks and found a meth pipe in his pants pocket.

Jeremy Hawks had a rental agreement with James Sisco for the upstairs of the house. He paid $50.00 per week. Everything upstairs was his. No one else lived upstairs. Dana Ray lived downstairs in a bedroom next to Sisco. The sheet or curtain across the doorway upstairs was to separate his living area from the others in the house. Another sheet may have separated the sleeping area of the room. The police never asked permission to enter his separate living area. Officer Johnson came through the sheets into the sleeping area without saying anything.

(Doc. # 35 at 1-3.)

**{¶ 4}** Based on the foregoing facts, the trial court engaged in the following analysis and reached the following legal conclusions:

Defendant argues that the police did not have an authorized consent to enter his bedroom area without a warrant. He states that the requisite authority is based "on mutual use of the property by persons generally

having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Post-hearing Mem., 1, quoting from *State v. Bradley*, 2d Dist. Montgomery No. 27509, 2017-Ohio-9224, 102 N.E.3d 618 (December 22, 2017), ¶ 16.

Officers Johnson and Cartee approached the residence with knowledge that the person they believed owned the house was not there. They decided to do a "knock and advise." By definition, that process is an approach to a residence without consent to search or enter in an attempt to obtain such consent. They approached a male grilling burgers in the yard outside on the west side of the house, identified as Dana Ray. They asked Ray to consent to entering and searching the house given that they did not have consent from the owner. They made no effort to have Ray provide evidence of his authority to allow entry and search of the premises. There is no evidence that Ray had any authority except as an occupant of the building. The officers did not ask Ray anything about where he resided in the house, where Hawks resided in the house, and any mutual use or control over any areas inside the house. There is no evidence offered by the state as to common use of any areas of the house. The police officers chose to have Ray sign a consent to search form rather than re-scheduling when the purported owner, James Sisco, could be there; or, when they could obtain a search warrant.

As indicated, the legal principle is that a third party can consent to a warrantless search if he "possesse[s] common authority over or other sufficient relationship to the premises" sought to be searched. *United States v. Matlock*, 415 U.S. 164, 171 (1974). At best, Ray was a co-inhabitant. There is no evidence of "mutual use of the property," or "joint access and control for most purposes" from which it may be reasonable to assume Ray had "the right to permit inspection in his own right."

The state argues there is "[n]othing in the record [that] seriously calls into question Ray's authority to allow the officers to enter the common areas of the home to find Defendant." State Mem., at 5. That argument ignores that the state has the burden of establishing common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). To establish common authority, the state must demonstrate that Ray had joint access or control over Hawks' bedroom for most purposes. The state's failure to establish this common authority demonstrates that it failed to show actual authority over the area where Hawks lived.

Nevertheless, a warrantless search could still be valid if the police relied in good faith on Ray's apparent authority to consent. *Rodriguez*, supra, 497 U.S. at 188. The existence of apparent authority must "be judged against an objective standard; would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." Again, the state has failed to present any evidence that would support a reasonable assumption

that Ray had apparent authority.

In this case, the police officers failed to make the requisite inquiries of Ray to provide a basis for a person of reasonable caution to determine whether Ray had mutual use and control of the area where Hawks resided; "warrantless entry without further inquiry is unlawful." *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005). That is what occurred here. Just having Ray sign a consent to search form does not meet the state's "burden of establishing the effectiveness of a third party's consent." *Id.* at 845, citing *Rodriguez*, 497 U.S. at 181. In fact, the testimony of Officer Johnson makes clear that the police officers were not concerned with Ray's "mutual use or control" over the areas where Hawks resided. This is not a case where the third party's consent is ambiguous as to his "mutual use or control." There was no inquiry into that issue at all.

When the police went upstairs and saw a sheet or curtain across the doorway, they were on notice that someone (they assumed Hawks) had an expectation that this was a private area, not an area of common usage by other habitants. Armed with written consent from Ray, (at best a co-inhabitant of the residence), and knowing the upstairs area was at least partially concealed by a curtain or sheet over the doorway, the police continued through the sheet or curtain and entered the sleeping area, confronting a naked Hawks and his naked female friend. The police officers were in Hawks' sleeping area without a right to be there, when Officer Johnson observed the baggie that he believed contained

methamphetamine. The argument for "plain view" is not applicable. *State v. Waddy*, 63 Ohio St.3d 424, 442, 588 N.E.2d 819 (1992). The search of Hawks thereafter, argued as incident to his arrest, produced a "meth pipe." All evidence obtained is a direct result of the unlawful police entry and search without a warrant.

Accordingly, the defense motion to suppress is GRANTED.

(Doc. # 35 at 3-5.)

{¶ 5} In its two related assignments of error, the State contends that Ray, a resident of 1782 Tuttle Avenue, had actual authority to consent to the officers' entry into and search of the house because he shared authority over it. (Appellant's brief at 6-7.) The State contends the officers were not required to inquire further about Ray's authority to consent because there was no ambiguity regarding who had "common authority over the common use areas of a residence, which is what Officer Johnson was asking for consent to search from Ray." (*Id.* at 7.)

{¶ 6} Even if Ray did not have actual authority to consent, the State argues that apparent authority existed. At a minimum, the State claims Ray's act of grilling outside the residence and his statement to officers that he lived there created an objectively reasonable belief that he shared common authority over the residence. (*Id.* at 8.) Finally, the State asserts that the officers had a "good faith basis" to enter Hawks' upstairs bedroom. The State argues that the officers had no reason to believe the upstairs area was a private bedroom and that officer Johnson entered it in good faith. The State also questions whether this issue is properly before us given the trial court's "limited" discussion of it. (*Id.* at 9-11.)

{¶ 7} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 8} With the foregoing standards in mind, we agree with the State that Ray had actual authority to permit the officers to enter the house and to search any areas over which he possessed common authority. Ray told the officers that he lived in the house, and suppression hearing testimony confirmed that he did. This court has recognized that "a police officer may validly enter and search a home, without a warrant, when the officer has obtained the voluntary consent of an occupant who shares * * * authority over the area[.]" *State v. Wallace*, 2d Dist. Montgomery No. 24383, 2011-Ohio-1741, ¶ 14. Valid third-party consent " 'rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' " *State v. Holloway*, 2d Dist. Clark No. 2017-CA-91, 2018-Ohio-4636, ¶ 27, quoting *United States v. Matlock*, 415 U.S. 164, 172, 94 S.Ct. 988, 39 L.Ed.2d 242, fn. 7 (1974). Because Ray lived in the house and had joint access to common areas, he had

actual authority to permit the officers to enter the house and to search those areas.

{¶ 9} The real issue is whether Ray's consent extended to Hawks' upstairs bedroom or whether the officers reasonably could have believed that it did. The suppression hearing transcript makes clear that Hawks' bedroom was his own private space, that he paid rent for it, and that it was not in any sense a "common area" of the house. Therefore, Ray lacked actual authority to permit the officers to search Hawks' upstairs bedroom.

{¶ 10} The next question is whether Ray had apparent authority to consent to a search of Hawks' bedroom. "Even if a third party does not possess actual common authority over the area that was searched, * * * the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search." *State v. McCartney*, 12th Dist. Clinton No. 2003-09-023, 2004-Ohio-4781, ¶ 15, citing *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "[U]sing an objective standard, third-party consent is valid if an officer looking at the then-available facts could reasonably conclude that the third-party had apparent authority to consent. * * * An officer's belief is not reasonable if the surrounding circumstances would lead a reasonable person to doubt the authority of the third party. *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, ¶ 13.

{¶ 11} When the officers approached Ray and obtained permission to enter and search the house, they had been told that it was occupied by at least three men: Ray, Hawks, and Sisco, the owner. After entering the house through a side door that led into the kitchen, they saw two unidentified people sitting on a couch in the living room. The unidentified people pointed upstairs when asked where Hawks could be found. The

officers then ascended a staircase where they encountered a door frame partially covered by a sheet. In its analysis, the trial court reasoned that "[w]hen the police went up the stairs and saw a sheet or curtain across the doorway, they were on notice that someone (they assumed Hawks) had an expectation that this was a private area, not an area of common usage by other inhabitants." (Doc. # 35 at 5.) We agree. At a minimum, the facts then available to the officers reasonably should have caused them to question whether the upstairs area was a location over which Ray had access and control. Therefore, the officers could not lawfully proceed through the doorway without engaging in further inquiry to clarify the situation. *United States v. Waller*, 426 F.3d 838, 846-847 (6th Cir. 2005) (citing numerous cases for the proposition that police cannot rely on apparent authority when the circumstances make it ambiguous or unclear whether the person giving consent has the necessary authority and no further inquiry or investigation is made); *Illinois v. Rodriguez* at 188-189 (recognizing that when the facts known to an officer would cause "a man of reasonable caution" to doubt whether the consenting party has authority over the area to be searched, "then warrantless entry without further inquiry is unlawful unless actual authority exists").

{¶ 12} Here the officers failed to inquire of Ray about where he stayed in the house. Nor did they ask him about the parts of the house to which he had access. They also failed to ask what part of the house Hawks lived in. (Hearing Tr. at 25-26.) The officers failed to ask any of these questions despite having been told before entering that at least three men lived in the house and that Hawks had been renting space from Sisco for several months. (*Id.* at 28.) Without knowing the answers to any of these questions, Officer Johnson proceeded past a sheet that partitioned an upstairs part of the house off

from other areas. (*Id.* at 17.) If Johnson had made any inquiry, he would have discovered that the area behind the sheet was Hawks' private bedroom and that Ray lacked authority to consent to a search of that area. Instead, when confronted with the ambiguous situation, he proceeded past the hanging sheet and found a "very shocked" and naked Hawks and a female companion.[1] (Hearing Tr. at 17.)

{¶ 13} In opposition to the trial court's finding that the officers had an obligation to inquire, the State asserts that no inquiry was required because no ambiguity existed. The State reasons that Ray's act of grilling outside the house and his statement that he lived there "made it reasonable and unambiguous that he lived in the home and had the authority to consent to the search." (Appellant's brief at 7.) The State also asserts that the staircase leading to Hawks' upstairs bedroom unquestionably was located in a common area. (*Id.* at 10.) The critical issue, however, is not whether uncertainty or ambiguity existed regarding Ray's authority to consent to the officers' entry into the home or even to their use of the staircase. Rather, as explained above, the issue is whether Ray's permission unambiguously extended to the area behind the hanging sheet upstairs. We agree with the trial court that Ray's authority to consent to a search of that area reasonably should have been unclear to the officers based on the facts then known to them. Therefore, Johnson did have an obligation to inquire further before proceeding past the sheet.

{¶ 14} Finally, we reject the State's argument that the officers had a good-faith

---

[1] Even then, Johnson did not turn away and exit the bedroom. Instead, he engaged in conversation with Hawks, requesting his identification and directing him to put pants on. (Hearing Tr. at 17.) Only after this did Johnson notice a baggie of methamphetamine on Hawks' dresser. (*Id.* at 17-18, 20-21.)

basis to enter Hawks' upstairs bedroom. In its appellate brief, the State frames this issue as one involving the good-faith exception to the exclusionary rule, which has been applied almost exclusively in the context of a defective search warrant or arrest warrant. *State v. Dennis*, 182 Ohio App.3d 674, 2009-Ohio-2173, 914 N.E.2d 1071, ¶ 57 (2nd Dist.). The State's post-hearing memorandum did not invoke the good-faith exception or even mention it. (Doc. # 34.) Nor did the State mention the good-faith exception to the exclusionary rule during the suppression hearing. But the State did argue below that the officers acted reasonably in entering Hawks' upstairs bedroom based on apparent authority. The doctrine of apparent authority requires a showing that law enforcement officers "relied in good faith on a third party's apparent authority to consent to the search." *McCartney*, at ¶ 15. Thus, in the present context, the doctrine of apparent authority and the good-faith exception to the exclusionary rule are essentially the same. Therefore, even assuming that the State can raise its good-faith argument, the argument necessarily fails. In its ruling below, the trial court recognized that the upstairs search could "be valid if the police relied in good faith on Ray's apparent authority to consent." (Doc. # 35 at 4.) It concluded that no apparent authority existed, however, and we have upheld that determination. Therefore, we see no support for the State's claim that the officers had a good-faith basis to enter Hawks' bedroom.

{¶ 15} Based on the reasoning set forth above, we overrule the State's two assignments of error and affirm the judgment of the Montgomery County Common Pleas Court.

. . . . . . . . . . . .

WELBAUM, P.J. and DONOVAN, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
Peter Certo, Jr.
Hon. Richard Skelton