[Cite as *State v. Klase*, 2019-Ohio-3392.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28323 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3372 |
| | : | |
| MICHAEL KLASE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of August, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

DANIEL B. RHODES, Atty. Reg. No. 0089545, 117 South Main Street, Suite 400, Dayton, Ohio 45422
        Attorney and Representative for Defendant-Appellee

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), the State of Ohio appeals from an order of the Montgomery County Court of Common Pleas, which granted Michael Klase's motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} The evidence at the suppression hearing consisted of the testimony of Officer Christopher White. His testimony established the following facts.

{¶ 3} At 6:18 p.m. on August 27, 2018, Officer White was dispatched to the residence of Klase's sister, Pam Snyder, who requested assistance with a mental health situation involving her brother. Mental health calls require two officers, and Officer Caleb Lawson also responded to the scene. Upon arriving, the officers approached Klase, who was calm and not aggressive. Officer White noticed Snyder gesturing to him from the corner of the garage, and he went over to speak with her.

{¶ 4} Snyder informed Officer White that Klase had been staying with her for a few days and that he was "not acting like himself." Snyder reported that Klase was convinced that there was a conspiracy against him propagated by the neighbors. Klase had also told Snyder that he had had an encounter with the police earlier that day during which the police had shot him, but the bullets went through him because he was invincible. (Officer White testified that no such encounter had occurred.) Klase had also mentioned a woman named Natalie, whom Klase believed was a demonic person with shapeshifting abilities; Klase was adamant that Natalie was going to die and that Klase was going to make sure that it happened that day. Officer White testified that it was unclear whether Natalie was a real or imagined person. Officer White stated that Klase told similar

information to Officer Lawson.

{¶ 5} Officer White testified that he decided to "pink slip" Klase.   White stated that a "pink slip" involves emergency hospitalization with a 72-hour hold, pursuant to R.C. 5122.10.   White stated that "[a] pink slip is the equivalent of an arrest but the difference is instead of going to jail you go to the hospital where you are evaluated for whatever the issue may be, in this case, mental illness."   According to White, scenarios where it is appropriate to take someone to be "pink slipped" include when the person expresses homicidal or suicidal ideation.

{¶ 6} After speaking with Snyder, Officer White returned to his partner and Klase. White explained to Klase that the officers would be taking him to the hospital.   Klase originally was adamant that he was not going to go, partly due to a belief that God would not allow it.   Klase sat down on a cot in the garage and asserted that God would not allow him to be removed from the cot; Klase told the officers that they would be stricken down by God if the officers touched him.   The officers removed Klase from the cot without any difficulty.   Klase became cooperative, and the officers walked Klase to a cruiser without any issues.   Officer White stated that he "cut a deal with [Klase] that [the officers] wouldn't handcuff him if he remained cooperative all the way to the hospital."

{¶ 7} White stated that, because a pink slip is equivalent to an arrest, the officers searched Klase and went through his pockets before placing him the back of the cruiser. The officers found marijuana, a pipe for smoking marijuana, and a "crack pipe" with black residue, which he put in an evidence bag.   Officer White further stated that Officer Lawson had found, but did not open, an Altoids container; that container was also placed in the evidence bag.   Officer White expressly testified that he conducted a full search,

not a pat-down for weapons. He stated that, although Klase was not under arrest due to suspicion of criminal activity, a "pink slip" is treated the same as an arrest.

{¶ 8} Upon arriving at the hospital, the officers took Klase to an assigned room. Hospital personnel requested that Klase change out of his clothes and into hospital garments. Klase's clothes were placed in a hospital property bag. According to White, per policy, the officers collected Klase's property and placed it off to the side to be provided to the hospital police. Officer White stated that the property would be inventoried by the Dayton officers and/or hospital police. White testified that they decided to help the hospital police with the inventory, and he noticed that Klase had an Altoids container that neither he nor Officer Lawson had opened during the prior search. White opened the tin and found what appeared to be crystal methamphetamine.

{¶ 9} Officer White later filed misdemeanor charges for possession of marijuana and possession of drug paraphernalia (minor misdemeanors). White requested a summons on the possession of drug paraphernalia based on the crack pipe, but he did not know if charges had been filed. White testified that he did not arrest Klase for a criminal offense.

{¶ 10} On November 6, 2018, Klase was indicted for aggravated possession of drugs (methamphetamine), a felony of the fifth degree. Klase moved to suppress the drugs, and the trial court conducted a hearing during which Officer White testified. The parties filed post-hearing memoranda. In its memorandum, the State asserted that the officers had probable cause "to arrest" Klase under R.C. 5122.10 and possibly for aggravated menacing based on his comments; the State claimed that the search of Klase was authorized as a search incident to a lawful arrest. The State further argued that the

subsequent search of the Altoids canister was permissible pursuant to inventory procedures.

{¶ 11} The trial court granted the motion to suppress, concluding that the State had failed to meet its burden of proving the validity of the warrantless searches for three reasons. The court first concluded that the officers' search did not constitute a search incident to a lawful arrest. It explained:

> This argument is flawed for the reason the Defendant Klase was not placed under "arrest" under R.C. 5122.10. By the very terms of this statute, Klase was taken "into custody," not in connection with a criminal charge, but for the noncriminal purpose of "being taken for examination by mental health professionals at a specified mental health facility identified by name." R.C. 5122.10 (C). Indeed, the person taken "into custody" pursuant to this statute must be advised "that the custody-taking is not a criminal arrest." *Id.*

> The State has offered no case law authority in support of the proposition that the "Search Incident to Arrest" Doctrine, which requires an arrest based upon probable cause that the defendant committed a criminal offense, extends to an administrative, noncriminal "custody-taking." Furthermore, R.C. 5122.10 does not itself authorize a warrantless search of the person taken "into custody."

{¶ 12} Second, the trial court concluded that the officers did not have probable cause to arrest Klase for aggravated menacing.

{¶ 13} Third, the trial court concluded that the State failed to show that the

warrantless search was pursuant to a standardized police department policy for inventory purposes. The court noted that the officer testified that whenever he "pink slips" an individual, he conducts an "inventory search" of the person's belongings before transferring the belongings to the hospital. The court further noted, however, that the officer "never testified the Dayton Police Department has a standardized, routine policy for such inventory searches, what that policy is, and how he acted in conformity with that standardized policy."

{¶ 14} The State appeals from the trial court's ruling. Its sole assignment of error states, "The trial court erred in finding that the warrantless search of defendant was in violation of the Fourth Amendment and in suppressing the State's evidence."

## II. Review of Suppression Decision

{¶ 15} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*.

{¶ 16} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the community-caretaking/emergency-aid

exception to the Fourth Amendment warrant requirement, a law-enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury may conduct a community-caretaking/emergency-aid stop.[1]  *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 26.

{¶ 17} Community caretaking functions are "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Accordingly, Ohio appellate courts generally have held that police officers are not required to possess reasonable articulable suspicion of criminal activity when exercising community caretaking functions/emergency aid.  *E.g., State v. Pattin*, 10th Dist. Franklin No. 17AP-575, 2018-Ohio-3876, ¶ 10; *State v. Norman*, 136 Ohio App.3d 46, 54, 735 N.E.2d 953 (3d Dist.1999).

{¶ 18}  "The touchstone of the Fourth Amendment is reasonableness."  *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).  Whether a search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances.  *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.  To assess the reasonableness of a search, courts must balance the need for the search against the invasions which the search entails.  *See Terry* at 20-21; *State v. Polk*, 150 Ohio St.3d

---

[1] The parties' arguments at the suppression hearing focused on whether the *search* of Klase was lawful.  Defense counsel did not argue that the initial encounter with Klase at Snyder's residence was unlawful or that the officers unlawfully took Klase into custody under R.C. 5122.10.

29, 2017-Ohio-2735, 78 N.E.3d 834; *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). In general, warrantless searches are per se unreasonable, subject to only a few specific well-established exceptions. *Leak* at ¶ 15, citing *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

*A. Nature of Klase's Detention*

**{¶ 19}** The State acknowledges in its reply brief that Klase was not arrested pursuant to criminal activity and that individuals subject to emergency civil commitment, such as Klase, are entitled to Fourth Amendment protections. At issue is the scope of those protections.

**{¶ 20}** Under R.C. 5122.10,[2] a police officer may take a person into custody and immediately transport him or her to a hospital if the police officer "has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (B) of section 5122 .01 of the Revised Code, and represents a substantial risk of physical harm to himself or others if allowed to remain at liberty pending examination." *See* former R.C. 5122.10; *In re J.L.*, 2d Dist. Montgomery No. 26938, 2016-Ohio-5649, ¶ 17.

**{¶ 21}** R.C. 5122.10 expressly states that a person subject to emergency

---

[2] R.C. 5122.10 was amended effective September 28, 2018. We rely on the version in effect at the time of the incident.

hospitalization under that section is not under arrest. The statute provides that "[a] person taking the respondent into custody pursuant to this section shall explain to the respondent: the name and professional designation and affiliation of the person taking the respondent into custody; *that the custody-taking is not a criminal arrest*; and that the person is being taken for examination by mental health professionals at a specified mental health facility identified by name." (Emphasis added.) Former R.C. 5122.10.

{¶ 22} Moreover, R.C. 5122.29 specifies certain rights to which "all patients hospitalized or committed pursuant to" R.C. Chapter 5122 are entitled. Those rights generally include, among others, the right to communicate freely with the patient's counsel and physicians; to receive visitors, make telephone calls, and send letters; to wear the patient's own clothes and maintain his or her appearance according to personal taste; to keep and use personal possessions, including toilet articles; to have individual storage space, spending money, and reading materials (without censorship); and to have reasonable privacy, to have social interaction with individuals of either sex, and to the free exercise of religious worship. R.C. 5122.29 further states that the patient has "[t]he right at all times to be treated with consideration and respect for the patient's privacy and dignity, including without limitation, the following:"

> (1) At the time a person is taken into custody for diagnosis, detention, or treatment under Chapter 5122. of the Revised Code, the person taking that person into custody shall take reasonable precautions to preserve and safeguard the personal property in the possession of or on the premises occupied by that person; * * *

{¶ 23} R.C. Chapter 5122 thus makes clear that a person who is taken into custody

for emergency hospitalization is not to be treated identically to an individual placed under arrest for criminal activity. At the suppression hearing, the officer oversimplified the matter when he testified that a "pink slip is the equivalent of an arrest but the difference is instead of going to jail you go to the hospital where you are evaluated for whatever the issue may be, in this case, mental illness."

*B. Search of Klase Prior to Transport to the Hospital*

{¶ 24} Among the exceptions to the prohibition against warrantless searches are the protective pat-down for weapons under *Terry* and a search incident to a lawful arrest under *Chimel v. California*, 395 U.S. 752, 762-763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Protective pat-downs for weapons and searches incident to a lawful arrest are distinct concepts with differing justifications and limitations.

Once a lawful investigatory stop has been made, a police officer may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. *State v. Evans* (1993), 67 Ohio St.3d 405, 408; *State v. Molette*, Montgomery App. No. 19694, 2003-Ohio-5965, ¶ 13. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans*, 67 Ohio St.3d at 408, quoting *Adams v. Williams* (1972), 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612.

To justify a patdown search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392

U.S. at 21. However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27; *State v. Smith* (1978), 56 Ohio St.2d 405, 407. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, citing *State v. Freeman* (1980), 64 Ohio St.2d 291, 295.

In contrast, "[w]hen conducting a search incident to arrest, police are not limited to a *Terry* pat-down for weapons, but may conduct a full search of the arrestee's person for contraband or evidence of a crime." *State v. Gagaris*, Butler App. No. CA2007-06-142, 2008-Ohio-5418, ¶ 16. "The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." *United State v. Robinson* (1973), 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427.

*State v. Todd*, 2d Dist. Montgomery No. 23921, 2011-Ohio-1740, ¶ 29-31.

**{¶ 25}** As stated above, the State argued to the trial court that Klase was "arrested" under R.C. 5122.10 and was properly subjected to a search incident to a lawful arrest. On appeal, the State appears to have modified its argument that Klase was "under arrest" when he was taken into custody and now asserts that "a search incident to emergency custody is permissible under the Constitution just as a search incident to arrest is

permitted."

{¶ 26} The State argues that a search arising from emergency custody is not limited to a *Terry* pat down. The State emphasizes that the touchstone of the Fourth Amendment is reasonableness, *see Cady,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706, and that a full search (akin to a search incident to a lawful arrest) for involuntary hospitalizations is reasonable because of the substantial risk that the individual could attempt to harm the officers or himself or herself, including with objects or items that are not typically used as weapons (e.g., pens or medication).

{¶ 27} In support of its argument, the State relies on cases from Washington, Utah, and South Dakota. Washington courts apply a "community caretaking" exception to the warrant requirement in the area of non-criminal investigations. *State v. Thompson*, 151 Wash.2d 792, 802, 93 P.3d 228 (2004); *State v. Lowrimore*, 67 Wash.App. 949, 957, 841 P.2d 779 (1992) (discussing "emergency situation" exception to the warrant requirement). For a search to fall within the community caretaking/emergency exception, the officer must be motivated by the need to render aid, a reasonable person under the circumstances would have thought that an emergency existed, and there must be some reasonable basis to associate the emergency with the place searched. *Thompson* at 802; *Lowrimore* at 957-958, citing *State v. Lynd*, 54 Wash.App. 18, 771 P.2d 770 (1989). Washington appellate courts have held that a search incident to a civil commitment is not limited to a weapons pat-down under *Terry*, because the officer "has a duty to identify and remove anything with which [a defendant] might harm himself or others, including street drugs." *State v. A.A.*, 187 Wash.App. 475 (2015), citing *State v. Dempsey*, 88 Wash.App. 918, 947 P.2d 265 (1997); *Lowrimore* at 957. Applying that standard, the

*Lowrimore* court concluded that the police officer reasonably searched Lowrimore's purse for weapons based on Lowrimore's emotionally unstable behavior and her parents' statements that she was threatening suicide and carrying knives.

{¶ 28} The State also relies on *State v. Collins*, 2002 Utah App. 253, 53 P.3d 953 (2002), in which the Utah appellate court concluded that "[a] person being placed in civil protective custody can expect to be searched the same as an individual who is placed in criminal arrest custody." *Id.* at 957. The court reviewed the Utah statute authorizing the involuntary commitment of an individual who, due to mental illness, is likely to injury himself/herself or others. The court noted a statutory "concern for the safety of both the individual being taken into custody and those the statute refers to as 'others.'" *Id.* The *Collins* court concluded that the statute gave implied authorization to conduct a search incident to taking an individual into custody pursuant to that statute. *Id.* The court continued: "Indeed a protective custody search of a mentally ill individual may be more warranted given the greater likelihood that they could injure themselves or others with a concealed weapon." *Id.*

{¶ 29} The *Collins* court further concluded that the scope of the statutorily-authorized search was not limited to "a simple weapons pat-down," again emphasizing that the purpose of the search under the statute was to protect not only the peace officer but also the mentally ill individual and others. The *Collins* court noted in a footnote that courts in Washington had discussed emergency circumstances and community caretaking; the Utah court found such a discussion unnecessary, as it relied on only statutory authority for the search.

{¶ 30} Citing *Collins*, the South Dakota Supreme Court similarly held that a search

incident to protective custody was permissible, although perhaps not as broadly. *Cordell v. Weber*, 2003 S.D. 143, 673 N.W.2d 49, 54 (2003). The court reasoned:

> South Dakota's involuntary commitment statutes also recognize the need to provide protection to the committed person and the public. SDCL ch. 27A-10. Therefore, when placed in protective custody, a person's reasonable expectation of privacy is curtailed for these purposes. A contrary conclusion would frustrate the legislative intent of preserving the safety of the public and the individual taken into protective custody. We agree that under the *Collins* rationale, a reasonable and limited protective search incident to involuntary commitment is permitted in order to protect the mentally ill individual and that person's custodians. A person placed in protective custody, while not having the same diminished expectation of privacy as an arrestee, does have a lesser expectation of privacy than the average citizen on the street.

*Id.* at 54-55.

{¶ 31} In response to the State's argument, Klase argues that emergency hospitalization is not arrest, and thus R.C. Chapter 5122 does not implicitly authorize a search incident to involuntary commitment akin to a search incident to a lawful arrest. Klase asserts that allowing such a search "would go against the legislative intent of R.C. 5122.10 and expose the patient to one of the highest degrees of intrusion to their [sic] privacy."

{¶ 32} Klase supports his argument citing *Lindsey v. State*, 282 Ga.App. 644, 639 S.E.2d 584 (2006). In *Lindsey*, a court order found, pursuant to a Georgia statute, that

Lindsey was a drug dependent person requiring involuntary treatment and presented a substantial risk of imminent harm to himself or others. The order commanded any peace officer to take Lindsey into custody and deliver him to a mental health facility or hospital emergency room for examination. An officer located Lindsey at a bar and explained the order to Lindsey. Pursuant to protocols governing arrests, the officers placed Lindsey in handcuffs, patted down Lindsey, and emptied Lindsey's pockets looking for weapons and contraband. The officer located methamphetamine and placed Lindsey under arrest.

{¶ 33} On appeal, the Georgia appellate court concluded that the drugs should have been suppressed. The court found that the custody authorized by the statute at issue was "plainly civil protective custody, not a criminal arrest." *Id.* at 646-647. The court thus concluded that "a peace officer executing an order to apprehend pursuant to [the statute] does not thereby arrest the person to be examined such that a search incident to arrest is authorized." *Id.* at 647. In a footnote, the *Lindsey* court acknowledged that "an officer who is transporting a person in a patrol car may, consistent with the Fourth Amendment, perform a suitably limited search for weapons to protect his own safety and that of the transported person and others in the area." *Id.* at fn. 7.

{¶ 34} In granting Klase's motion to suppress, the trial court rejected the State's argument that it was entitled to conduct a warrantless search as a search incident to a lawful arrest. We agree with the trial court's conclusion. "While the criminal law of search, seizure, and arrest may be helpful by way of analogy in analyzing the validity of searches incident to civil detention, there is a basic difference between criminal detentions and civil detentions and, therefore, the rules of the former do not routinely apply to the latter." *Lowrimore*, 67 Wash.App. at 956, 841 P.2d 779.

**{¶ 35}** Moreover, as discussed above, the nature of a commitment under R.C. 5122.10 is not akin to an arrest. The purpose behind a police officer's authorization to take a person into custody under R.C. 5122.10 is not grounded in criminal law enforcement, but instead in the need to provide mental health treatment to an individual who is a danger to himself/herself or others. Moreover, by statute, persons subject to emergency commitment retain greater interest in their privacy and personal autonomy than those subject to a criminal arrest. Accordingly, we agree with the reasoning of the *Lindsey* court that a police officer who takes custody of an individual under R.C. 5122.10 "does not thereby arrest the person to be examined such that a search incident to arrest is authorized." *Lindsey*, 282 Ga.App. at 647, 639 S.E.2d 584; *see also State v. Harlow*, 123 N.H. 547, 552, 465 A.2d 1210 (1983) (construing a statute allowing for protective custody of incapacitated intoxicated persons as limiting "the scope of searches of individuals in protective custody to what is necessary to obtain identification and to protect the officer, jailer, or others, * * * consistent with the legislature's intent to treat such persons as sick and socially disabled persons, not as criminals.").

**{¶ 36}** As we have previously stated, " '[w]e are sensitive to the delicate balance between Fourth Amendment rights and a police officer's safety.' " *State v. Shern*, 2018-Ohio-5000, 126 N.E.3d 322, ¶ 24 (2d Dist.), quoting *Smith v. Muniz*, E.D.Cal. No. 2:15-cv-1318-TLN-EFB P, 2017 WL 5010476, *8 (Nov. 2, 2017), quoting *In re Frank V.*, 233 Cal.App.3d 1232, 1238, 285 Cal.Rptr. 16 (1991). We agree with courts throughout the country that, for the safety of the police officers and others, police officers may conduct limited pat-down searches for weapons prior to placing an individual subject to emergency hospitalization in a cruiser and transporting that person to the hospital. However, in light

of the fact that the officers did not open the Altoids container when Klase was taken into custody, we need not establish any bright-line test as to whether the officers lawfully retrieved items from Klase's pockets and could have opened the Altoids container prior to placing Klase in the cruiser. Rather, we hold that a police officer may not conduct a search akin to a search incident to a lawful arrest based solely on the ground that a person is being taken into custody under R.C. 5122.10.

{¶ 37} In this case, the officers conducted a search of Klase's person prior to transporting Klase to the hospital. The officers went into and removed items from Klase's pockets, including drug paraphernalia and the Altoids container. The officers placed these items in a police evidence bag. The Altoids container was not opened before Klase was placed in the cruiser, and the methamphetamine was not found prior to transportation to the hospital.

{¶ 38} After Klase arrived at the hospital, Klase was placed in a hospital room and asked to put on hospital garments. Officer White collected Klase's belongings and placed them in a hospital property bag; Klase was no longer in possession of any of his personal belongings. Officer White testified that, at this time, he noticed the tin Altoids container, which had not yet been searched. Officer White stated that, knowing that Klase was "under arrest" and that the canister was Klase's property, he believed that he could open the canister and see what was inside of it. Officer White was aware, based on his experience, that Altoids containers were sometimes used for "stashing drugs."

{¶ 39} Under these facts, Officer White could not rely on a "search incident" rationale to open the Altoids canister. Assuming for sake of argument that the Altoids container had been properly seized by the officers during the prior search of Klase, the

search of the Altoids canister at the hospital was not then necessary to ensure the safety of the officer, Klase, or others. *Accord Harlow*, 123 N.H. at 552, 465 A.2d 1210 (search of wallet of person in protective custody violated Fourth Amendment when the search was unnecessary to determine the person's identity or to protect the officer, jailer, or others). Accordingly, Officer White's search of the Altoids container, based on the fact that Klase had been taken into custody under R.C. 5122.10, was unreasonable.

*C. Inventory Search*

{¶ 40} The State further claims that the methamphetamine in the Altoids container inevitably would have been discovered as part of the inventory search of Klase's possessions conducted at the hospital.

{¶ 41} "The inventory-search exception is a well-defined exception to the Fourth Amendment's warrant requirement." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 20, citing *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). "An inventory search is not subject to the Fourth Amendment's warrant requirement or a probable-cause review, because it is a search that is made for administrative reasons and is unrelated to a criminal investigation." *Id.*

{¶ 42} The Ohio Supreme Court recently expressed that it "take[s] no issue with the reasonableness of an administrative policy requiring the search and inventory of personal items that necessarily come into police custody as a result of an arrest." *Banks-Harvey* at ¶ 23. It stated:

As a practical matter, the personal effects with a person at the time of his or her arrest must be stored while the person is in jail. And because the police are potentially responsible for the items, they are permitted to search and

inventory the personal effects that come into their custody. *Colorado v. Bertine*, 479 U.S. 367, 373, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (upholding the search of a backpack in a vehicle as part of an inventory search of a lawfully impounded vehicle). This administrative search and inventory is intended to help guard against claims of theft or careless handling and also protects the police from dangerous instruments. *Id. Accord Lafayette*[, 462 U.S.] at 647, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (upholding the inventory search of an arrestee's shoulder bag conducted at the police station). Even if less intrusive means of protecting property are available, such as sealing items in a plastic bag and placing them in a secured locker rather than searching and inventorying them, it is not unreasonable for police, as part of routine procedure incident to incarceration, to search any article or container in the arrestee's possession in accordance with established inventory procedures. *Lafayette* at 647-648, 103 S.Ct. 2605.

*Banks-Harvey* at ¶ 21.[3]

{¶ 43} *Banks-Harvey* involved an inventory search incident to the arrest. We have found no Ohio cases discussing the scope of an inventory search incident to a civil

---

[3] The Ohio Supreme Court in *Banks-Harvey* nevertheless found the search of the defendant's purse to be unlawful. It reasoned that, after defendant's arrest, the trooper did not lawfully retrieve the defendant's purse from the vehicle she had been driving and therefore the purse did not come into police custody as a result of her arrest. The court thus concluded that the inventory exception did not apply to justify the trooper's search of her purse.

commitment under R.C. 5122.10.[4]

---

[4] Other jurisdictions have taken varying approaches to inventory searches for civil commitments. Several courts have held that the rationale for inventory searches applies equally to criminal arrestees and civil detainees when brought to jail. *Cordell*, 2003 S.D. 143, 673 N.W.2d at 55, citing *State v. Friend*, 711 S.W.2d 508 (Mo.1986); *State v. Toto*, 123 N.H. 619, 465 A.2d 894 (N.H.1983); *State v. Johnson*, 122 N.M. 713, 930 P.2d 1165 (Ct.App.1996).

In Colorado, the supreme court distinguished between inventory searches of the property of persons under arrest and those taken into protective custody under a statute that authorized certain intoxicated persons to be taken to a treatment facility, rather than placed under arrest. The Colorado court held that, "[b]ecause civil detainees cannot be treated as arrestees, there are two rules for inventory searches." *State v. Chaves*, 855 P.2d 852, 855 (1993). The court explained:

> * * * When an inventory search is undertaken pursuant to an arrest, the police officer may completely search all of the arrestee's belongings, including closed containers like suspected "bindle." When such a search is conducted pursuant to protective custody, however, the scope of the officer's inventory search is limited by the privacy interest of the detainee, and any closed containers must be set aside and a warrant obtained before they may be opened. Recognition of these separate rules is compelled by the Colorado Alcoholism and Intoxication Treatment Act. The status of the person subjected to the search (i.e., whether a person has been arrested or taken into protective custody) determines, within the parameters of reasonableness, how the inventory search may be conducted.
>
> This requirement that the police abide by different rules in different contexts is not unusual. Police officers frequently are given statutory duties that are civil in nature. "The policeman, as a jack-of-all-emergencies, has 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses.' " 2 Wayne R. LaFave, Search and Seizure § 5.4(c) p.525 (2d ed. 1987) (quoting ABA Standards for Criminal Justice § 1-1.1(b) (2d ed. 1980)). The purpose of the inventory search of a civil detainee is not to find drugs, but to ensure that all of the detainee's possessions are held safely for him or her. The search also permits the officers to remove and isolate all possessions which may be dangerous if the detainee were permitted to retain the items while in custody, but does not permit the officers to search closed containers without a warrant.

(Citations omitted.) *Chaves* at 855. The Colorado Supreme Court thus affirmed the suppression of cocaine discovered inside a folded dollar bill during an inventory search conducted by the police after taking the intoxicated defendant into protective custody.

Citing *Chaves* and other cases, Klase argues that the scope of an inventory search for civil commitments should be more limited in this case. Because the State failed to establish that the officer conducted a lawful inventory search under Ohio's standard when a person's property comes into police possession as a result of an arrest, we do not need

{¶ 44} A critical aspect of an inventory search in Ohio is that it must be conducted in accordance with an existing policy.    Inventory searches may constitutionally extend to a search of closed containers "if there is in existence a standardized policy or practice specifically governing the opening of such containers."    *State v. Hathman*, 65 Ohio St.3d 403, 604 N.E.2d 743 (1992), paragraph two of the syllabus; *State v. Reese*, 2d Dist. Champaign No. 2018-Ohio-10, 2019-Ohio-399, ¶ 14.

{¶ 45} "A police officer's assertion that an inventory search was done pursuant to a police department policy is not sufficient, standing alone, to meet the State's burden of proving that a warrantless search was reasonable because it fits within the inventory search exception to the warrant requirement."    *State v. Myrick*, 2d Dist. Montgomery No. 21287, 2006-Ohio-580, ¶ 13, citing *State v. Wilcoxson*, 2d Dist. Montgomery No. 15928, 1997 WL 452011, *4 (July 25, 1997); *State v. Cantrel*, 2d Dist. Montgomery No. 27839, 2018-Ohio-3501, ¶ 41.    To establish a lawful inventory search based on standard police practice, " 'the evidence presented must demonstrate that the police department has a standardized, routine policy, demonstrate what that policy is, and show how the officer's conduct conformed to that policy.' "    *Id*., quoting *Wilcoxson* at *4.

{¶ 46} The trial court found that the State failed to show that the warrantless search of Klase's personal property was conducted pursuant to a standardized police department policy for inventory purposes.    We agree.

{¶ 47} Office White testified on direct examination about the inventory procedures for emergency hospitalizations as follows:

Q: And what do you do with the property?    Once he is stripped of his

_____

to determine whether Ohio law supports a different standard for civil commitments.

property, he's put into the garment, what do you do with that property?

A: Unlike someone who voluntarily goes to the hospital or is admitted by us for other reasons – maybe they just are in need of medical aid or something like that – again, pink slips are equivalent to arrest. And so what becomes of his property is it is taken into custody by the police department of the hospital and they hold onto it pending whatever is to come next.

Q: Are those items inventoried before giving them –

A: Yes.

Q: And go on, if you'd explain that.

A: They're inventoried before. We don't have to help the hospital with inventorying them. We can easily just give them the stuff and say, hey, we went through it but if you want to go through it again, go for it. But, at the time, I noticed that there was a tin of Altoids can that I had not opened at the time of originally searching him but having him already been under arrest and knowing it was his property, I still knew I could open it and see what was going on inside of it. And I have seen those tins used before for stashing drugs. * * *

Q: And did you go through the tin solely because of that or also because you were inventorying –

A: Inventorying it. Like I said, we were trying to help the hospital out and I saw the tin and realized I had not yet gone through it prior.

On cross-examination, Officer White testified that, after Klase changed into hospital garments, his belongings were placed in a hospital property bag, which White handed

over to the hospital police department staff. White confirmed that the officers had placed the Altoids container in a police evidence bag prior to transporting Klase to the hospital.

{¶ 48} Officer White's testimony indicated that Klase's property would be inventoried, but also implied that he was suspicious that it contained drugs. Regardless, the officer did not testify that a specific Dayton Police Department policy required him to conduct an inventory search prior to turning over Klase's property to the hospital police. Moreover, White did not indicate that a Dayton Police Department policy authorized him to open Klase's closed containers as part of his involuntary emergency commitment. No policy was offered into evidence.

{¶ 49} Officer White's testimony suggested that an inventory search would be conducted in accordance with hospital policies and that he (White) conducted the search to assist the hospital police. The State did not offer the hospital's policy into evidence, nor was there any evidence that any policy authorized Dayton police officers to conduct an inventory search for the hospital police. Moreover, contrary to the State's assertion, there is no indication that a hospital inventory search is a "customary and typical procedure" similar to a jail inventory search.

{¶ 50} Accordingly, the trial court did not err in concluding that the State did not establish that Officer White's warrantless search of Klase's personal property at the hospital was conducted pursuant to a standardized police department policy for inventory purposes.

*D. Good Faith Exception*

{¶ 51} Finally, the State contends that the evidence should not have been suppressed, because Officer White "was acting in good faith when he searched Klase

and had a reasonable belief, even if mistaken, that he was authorized to search Klase." The State did not raise a good-faith argument in the trial court in its post-hearing memorandum.

**{¶ 52}** "When an officer acts with an objectively reasonable, good-faith belief that his or her conduct is lawful, the deterrence rationale for the exclusionary rule loses force." *Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 33, citing *Davis v. United States*, 564 U.S. 229, 241, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. * * * [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

**{¶ 53}** "The United States Supreme Court has applied the good-faith exception to searches conducted in objectively reasonable, good-faith reliance on an invalid search warrant issued by a detached and neutral magistrate, to searches conducted in reasonable reliance on subsequently invalidated statutes, to searches conducted in reasonable reliance on erroneous information in a warrant database, and to searches conducted in reasonable reliance on binding judicial precedent." (Citations omitted.) *Banks-Harvey* at ¶ 33; *see also State v. Hawks*, 2019-Ohio-2350, __ N.E.3d __, ¶ 14 (2d Dist.) (the good-faith exception has been applied almost exclusively in the context of a defective search warrant or arrest warrant).

**{¶ 54}** We do not question that Officer White acted with subjective good faith when he opened the Altoids container at the hospital. However, viewing his actions

objectively, we conclude that the officer's opening of the closed Altoids container at the hospital was not reasonable under the Fourth Amendment.

### III. Conclusion

**{¶ 55}** The State's assignment of error is overruled. The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J., concurs.

WELBAUM, P.J., dissents:

**{¶ 56}** I respectfully dissent from the majority's holding in this case and would have reversed the trial court's decision granting Klase's motion to suppress. In my opinion, given the nature of R.C. 5122.10 and R.C. 5122.29, the initial search of Klase's pockets and the subsequent search of the Altoids tin was reasonable under the Fourth Amendment.

**{¶ 57}** I agree with the case law out of Washington and Utah holding that the scope of a search conducted on a mentally ill person in need of emergency hospitalization is not limited to a *Terry* pat down. *See Lowrimore*, 67 Wash.App.949, 957, 841 P.2d 779; *Collins*, 2002 Utah App.253, 53 P.3d 953. *Lowrimore* and *Collins* both involved statutes similar to R.C. 5122.10, and both of those cases stand for the proposition that the statutes impliedly authorized a peace officer to conduct more than a *Terry* pat down on the person being placed into custody so as to insure the safety of that person and others. *Lowrimore* at ¶ 957; *Collins* at ¶ 14. In my opinion, a mere *Terry* pat down would not guarantee the safety of mentally ill persons who could harm themselves or others with seemingly

innocuous items such as a fountain pen or medication.

{¶ 58} I also agree with *Collins* that "[a] person being placed in civil protective custody can expect to be searched the same as an individual who is placed in criminal arrest custody." *Collins* at ¶ 15. Although a mentally ill individual placed into protective custody is not an arrestee, I believe there is a significant overlap between a search incident to arrest and a search incident to placing a mentally ill person in protective custody. This overlap is due to the significant danger that mentally ill individuals could injure themselves or others with seemingly innocuous items. Therefore, like a search incident to arrest, I believe it is reasonable for an officer to remove all items of property found on a mentally ill person being taken into custody and to also open all containers found on that person. *See State v. Frazee*, 2d Dist. Montgomery No. 26699, 2015-Ohio-4786, ¶ 19 (a search incident to arrest may extend to the personal effects of an arrestee including opening containers found on the arrestee's person). This is especially true in this case considering the fact that Officer White had discovered drugs and drug paraphernalia in Klase's pockets, thereby providing the officer with probable cause to believe the Altoids tin contained drugs.

{¶ 59} It was also reasonable for the officer to open the Altoids tin in order to preserve and safeguard Klase's property. Pursuant to R.C. 5122.29(B)(1), Officer White was required to "take reasonable precautions to preserve and safeguard the personal property in the possession of [the mentally ill person being taken into custody for emergency hospitalization]." In my opinion, this authorized Officer White's examination of the Altoids tin. If the Altoids tin had contained money or some other lawful item of value, it would have been necessary to know about those items so as to insure their safe

return. Therefore, I believe that R.C. 5122.29(B)(1) is a reasonable, protective law that authorizes an officer to open containers found on a mentally ill person who is being taken into custody for emergency hospitalization. Accordingly, because Officer White was acting under the dictates of this statutory mandate, opening the Altoids tin was, in my opinion, reasonable.

{¶ 60} The majority mentions that under R.C. 5122.29, mentally ill patients subject to emergency hospitalization are entitled to certain rights such as "to keep and use personal possessions." R.C. 5122.29(F)(4). However, it is important to note that this portion of the statute also states that such rights must be "consistent with health and safety." R.C. 5122.29(F). At the time a mentally ill person is placed in custody for emergency hospitalization he or she has 24 hours to be examined. R.C. 5122.10(E). It may not be until after this examination that medical professionals would know whether possessing certain items of property is consistent with the person's health and safety. It is therefore reasonable to remove the items of property found on a person who is taken into custody under R.C. 5122.10 until it is determined that possessing such property is consistent with the person's health and safety.

{¶ 61} Overall, the search at issue in this case was reasonable when balancing the need for the search against the invasions that the search entailed. In my opinion, the need to protect mentally ill persons from harming themselves or others is greater than the right of privacy that they have in containers found on their person at the time they are taken into civil custody. For this reason, I respectfully dissent from the majority's holding and would have reversed the decision of the trial court.

Copies sent to:

Mathias H. Heck
Heather N. Jans
Daniel B. Rhodes
Hon. Mary E. Montgomery